## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
********************************************
                                           *
JOHN DOE,                                  *
                                           *
        Plaintiff                          *
                                           *
    v.                                     *
                                           *
                                           *     CIVIL ACTION NO. 14-CV-30114
AMHERST COLLEGE, CAROLYN                   *
"BIDDY" MARTIN, SUZANNE COFFEY,            *
ALLEN HART, FRANCES TULEJA,                *
LAURIE FRANKL, and SUSIE MITTON            *
SHANNON                                    *
                                           *
        Defendants                         *
**************************************
```

## VERIFIED COMPLAINT

### INTRODUCTION

This is a verified complaint for monetary damages and injunctive relief filed by a student at Amherst College against the Defendant College, its President, and certain administrators for federal and state civil rights, statutory, and common law violations due to the Defendants' arbitrary, unfair, wrongful, and unlawful decisions to: (i) withhold the student's degree and subject him to other, additional sanctions, up to and including expulsion, for an incident that took place in December of 2009 and was resolved in March of 2010 by administrators in accordance with policies and procedures set forth in the College's Honor Code; and (ii) withdraw the offer of a fellowship to work in the College's Office of Admissions based on the student's record of disability and/or the College's regard for him as a disabled person.

**JURISDICTION AND VENUE**

1.  This action arises under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, Title IX of Education Amendments of 1972, 20 U.S.C. § 1681, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Civil Rights Act of 1871, 42 U.S.C. § 1981.

2.  This Court has jurisdiction of this claim under, and by virtue of, 28 U.S.C. § 1331.

3.  Venue is proper under 28 U.S.C. § 1391(b).

4.  This Court is authorized to issue the Injunctive Relief requested by Plaintiff under Rule 65 of the Federal Rules of Civil Procedure.

5.  This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

**PARTIES**

6.  Plaintiff JOHN DOE is and was at all times material to this complaint a student attending the Defendant Amherst College.  He is a citizen of the country of South Africa and currently resides in Hampshire County.

7.  Defendant AMHERST COLLEGE ("the College") is a private, non-profit college located in Amherst, Massachusetts and the recipient of federal funding/assistance under 20 U.S.C. §§ 1681-1688, 29 U.S.C. §794, and 42 U.S.C. § 2000d.

8.  Defendant CAROLYN "BIDDY" MARTIN has the President of the College since June of 2011.  She is being sued in her individual and official capacity.

9.   Defendant SUZANNE COFFEY has been the Chief Student Affairs Officer at the College since February of 2014.  Previously, she served as the College's Title IX Coordinator.  She has been designated to serve as Chair of the upcoming Sexual Misconduct Hearing Board scheduled to adjudicate a Complaint against Plaintiff. She is being sued in her individual and official capacity.

10.  Defendant ALLEN HART has been the Dean of Students and/or the Dean for New Students since the 2009-10 academic year.  He is being sued in his individual and official capacity.

11.  Defendant FRANCES TULEJA has been an Assistant Dean of Admission at the College since the start of the 2010-11 academic year.  During the 2009-10 academic year, Defendant TULEJA served as the College's Dean for Student Conduct and Title IX Coordinator.  She is being sued in her individual and official capacity.

12.  Defendant LAURIE FRANKL has been the College's Title IX Coordinator since December of 2013.  She is being sued in her individual and official capacity.

13.  Defendant SUSIE MITTON SHANNON has been an Assistant Dean of Students, the Dean of Student Conduct, and Title IX Deputy Coordinator since the start of the 2013-14 academic year.  She is the Complainant in the aforementioned matter scheduled to be adjudicated before the Sexual Misconduct Hearing Board.  She is being sued in her individual and official capacity.

**STATEMENT OF FACTS**

*The 2009-10 Student Handbook*

14. The *Student Handbook* is an annual publication of the Amherst College Office of Public Affairs.  (*See* **Ex. A**, *2009-10 Student Handbook*, Excerpts.)

15. The *2009-10 Student Handbook* was published in advance of the 2009-10 academic year and contains the "Amherst College Honor Code."  (*Id.* at 10.)

16. Upon entering the College, each student must sign, in the presence of a member of Dean of Students' Office, a pledge to abide by the Honor Code.  (*Id.*)

17. "The Disciplinary System" subsection of the Honor Code begins by articulating an expectation that all persons in the community, including students, "will exercise their best will and seek to resolve disagreements as amicably and informally as possible."  (*Id.* at 12.)

18. The Honor Code then states that "[t]he Dean of Students' office is available to help reach such informal resolutions" and characterizes the disciplinary system as something that only "exists for those situations that will not, or cannot, be resolved through amicable discussion."  (*Id.*)

19. According to the Honor Code, all alleged violations of it "fall within the jurisdiction of the Dean for Student Conduct, who is appointed by the Dean of Students, and of the Committee on Discipline."  (*Id.*)

20. Appendix A to the Code is a "College Council Statement on Sexual Harassment."  (*Id.* at 23.)

21. It contains a subsection entitled "Sexual Assault," which identifies DEFENDANT FRANCES TULEJA as the "Dean for Student Conduct" and instructs any student considering bringing a claim of sexual misconduct to contact her.  (*Id.* at 25-26.)

22. Upon information and belief, DEFENDANT TULEJA simultaneously served as the College's Title IX Coordinator for the 2009-10 academic year.  (**Ex. B**, 2009-10 Amherst College Catalog, Excerpt, pg. 2.)

23. By March 31, 2010, DEFENDANT ALLEN HART served as the Dean of Students.  (*See* **Ex. C**, Letter from Allen J. Hart, Dean of Students & Professor of Psychology, to John Doe (Mar. 31, 2010).)

24. Another subsection of the Honor Code entitled, "Initiating a Complaint," notes that "[i]t is in the interest of the college community that violations of the Code of Conduct be handled expeditiously."  (*2009-10 Student Handbook* at 14.)

25. The Honor Code subsequently states:

> *Any complaint should be initiated within 90 days after the alleged violation of the Honor Code occurs.  In recognition that students or other members of the community may have valid motives that would inhibit the initiation of a complaint, the Dean for Student Conduct may extend the period for bringing a charge well beyond the normative 90-day framework.  Examples of valid motives range from difficulties related to the calendar and absence from campus to the possible consequences of cases of sexual assault . . . .*

(*Id.*)

26. When a student wishes to initiate a formal complaint, it is the responsibility of the Dean for Student Conduct to "assist the complainant to prepare a brief statement of the complaint, which must be signed by the complainant."  (*Id.*)

27. An accused student is entitled to "a copy of the complaint" and may choose to offer a statement in response.  (*Id.*)

28. The Honor Code provides that the Dean for Student Conduct must "investigate all complaints" and in the course of so doing will typically "interview the complainant, the accused student, and any other person whose testimony may be useful to the process of determining the merit of the charge."  (*Id.*)

29. Within ten work days of receiving a complaint, the Dean for Student Conduct must "make one of" a number of "determinations."  (*Id.*)

30. Among the determinations that must be made are the following:

> 3.    The complaint has merit, and all parties to the dispute agree to the material facts of the case. Therefore, a finding is warranted that the student has violated the Honor Code.  Guided by the statement on penalties, the Dean for Student Conduct will assess appropriate penalties which may include . . . suspension from the college for no more than one semester.  Any penalties resulting from this determination may be appealed to the President of the College, within 10 working days of receipt of the Dean's determination.

> 4.    The complaint appears to have merit, but material facts of the case are disputed.  Therefore, the case will be referred by the Dean of Student Conduct to the Committee on Disciple for adjudication.

> 5.    The complaint has merit, and, whether or not there is a dispute about the material facts of the case, a finding that the accused student has violated the Honor Code as charged could result in a penalty greater than one semester suspension from the college.  Therefore the case will be referred by the Dean of Student Conduct to the Committee on Discipline for adjudication.

(*Id.* at 15.)

31.  The Honor Code confers on the Dean for Student Conduct the discretion to initiate a complaint on behalf of the college and refer the matter to the Committee on Discipline for adjudication.  (*Id.*)

32.  The Honor Code provides that the Committee on Discipline is only to accept such a complaint when the "alleged violation appears to be of sufficient gravity to pose a threat to the college community or its members."  (*Id.* at 13.)

33.  With respect to "penalties," the Honor Code sets forth a number of sanction that may be imposed including:

> **Disciplinary Probation**: This consists of a warning in writing which specifies that further infractions of the Honor Code during a student's time at Amherst will, in most instances, lead to suspension, dismissal or, in very serious cases, expulsion from the college. . . . [and]

> **Dismissal**: A student may be required to leave the campus for at least one semester and must petition for readmission at the end of that time.  The student may be required to fulfill certain obligations while away from the college and to provide evidence of having done so, along with evidence of his/her readiness to return to Amherst and meet its standards of conduct.

(*Id.* at 20-21.)

34.  With respect to appeals, the Code states that "[e]ither the accused student or the complainant may appeal a decision of the Committee on Discipline to the President of the College."  (*Id.* at 22.)

35.  Potential appellate grounds available to parties following a hearing include "procedural error" and "the inappropriateness of the sanction."  (*Id.* at 22.)

36.  Such appeals must be made in writing and submitted to the President within ten (10) working days of receipt of the unfavorable finding.  (*Id.*)

37.   As noted above, Appendix A to the Code consists of a "College Council Statement on Sexual Harassment."  (*Id.* at 23.)

38.   It does not provide a definition of "sexual harassment," but notes instead that it can encompass a "wide range of behavior, from the actual coercing of sexual relations to the forcing of sexual attentions, verbal or physical, on a non-consenting individual."  (*Id.*)

39.   On the one hand, the Code states that "Amherst College will seriously and thoroughly investigate any complaint of sexual harassment and will discipline those found guilty."  (*Id.* at 24.)

40.   On the other hand, the Code recognizes that:

> A student who believes that he . . . has been harassed may choose to consult . . . a dean or other member of the administration . . . . Informal consultation is entirely optional; it has as its goal to . . . review the individual's experience.  It also includes exploration of the alternatives, both formal and informal, available to the student and offers support in implementing . . . his decisions.

(*Id.* at 25.)

41.   The final subsection of Appendix A is entitled "Sexual Assault."  (*Id.*)

42.   Among other things, it empowers the college to "impose the full range of disciplinary sanctions . . . on students who are found guilty of having committed infractions involving sexual harassment, sexual assault, rape or other sex offenses."  (*Id.* at 26.)

43.   As noted above, the Code instructs students considering bringing such charges to contact DEFENDANT TULEJA.  (*Id.*)

8

*Plaintiff's Medical Leave*

44.   Plaintiff began attending the College in the fall of 2009.

45.   At the start of his freshman year, Plaintiff was assigned to share a dormitory room
      with an openly gay white roommate named STUDENT A.

46.   On December 18, 2009, Plaintiff and STUDENT A had a consensual sexual
      encounter.

47.   At some point shortly thereafter, STUDENT A made a report to College officials
      claiming that the encounter was not consensual.

48.   At the start of the 2010 Spring Semester, Plaintiff had two other alcohol-related
      incidents that resulted in reports to College officials.

49.   On each of these occasions, Plaintiff entered dormitories where he did not reside
      and startled inhabitants by his presence.

50.   In March of 2010, Plaintiff met on multiple occasions with DEFENDANTS
      HART and TULEJA and was interrogated by the two Deans with respect to each
      incident and the underlying causes of his behavior.

51.   Plaintiff vehemently denied assaulting STUDENT A, but acknowledged that he
      was struggling to come to terms with his own sexual identity due largely to his
      very traditional upbringing in South Africa.

52.   Plaintiff also acknowledged that he had been using alcohol to suppress and avoid
      these feelings.

53.   Upon information and belief, DEFENDANTS HART and TULEJA also met on
      multiple occasions with STUDENT A.

54. At no point during this process was Plaintiff provided with a complaint or any other document detailing STUDENT A's account of the night in question.

55. No such documentation was provided to Plaintiff because STUDENT A did not initiate a complaint. (*See* **Ex. D**, E-Mail from Laurie Frankl to Plaintiff (June 6, 2014).)

56. At the end of this process, Plaintiff was advised that his presence on campus could no longer be tolerated and he was given less than one week to vacate the premises.

57. On or about March 27, 2010, Plaintiff complied with the order and boarded a plane back to South Africa.

58. In a letter dated March 31, 2010, DEFENDANT HART memorialized the reasons for, and terms of, his departure. (Letter from Allen J. Hart (Mar. 31, 2010).)

59. DEFENDANT HART stated that a determination had been made that Plaintiff had "engaged in multiple episodes of improper, non-consensual personal contact with other students," including STUDENT A. (*Id.* at 1.)

60. According to DEFENDANT HART, these "actions violated the standards of the Honor Code." (*Id.*)

61. While said violations "could have resulted in disciplinary action being taken . . . , including a likely disciplinary suspension," DEFENDANT HART "took into consideration the fact that [Plaintiff's] alcohol use and resulting behavior reflected some deeper personal issues with which [he] had been struggling for some time." (*Id.*)

62. Accordingly, DEFENDANT HART "decided to place [Plaintiff] on a medical withdrawal, rather than impose a disciplinary suspension, in order to allow [him] the opportunity to address those issues in a therapeutic, rather than a punitive, manner." (*Id.*)

63. "The conditions associated with [this] medical withdrawal" mandated that Plaintiff spend "the remainder of the year away from Amherst." (*Id.*)

64. They also required him to: (i) "seek treatment from a licensed mental health professional . . . during his time away"; (ii) "provide a statement," in his application for readmission, "identifying the extent to which [his] mental health concerns had been addressed"; (iii) "submit a letter from [his] treating physician, psychologist, or psychiatrist, confirming [his] readiness to resume full-time study at Amherst College"; and (iv) permit his therapist to speak with DEFENDANT HART and a representative of the College's Counseling Center. (*Id.*)

65. Before being forced to leave campus, Plaintiff could have invoked and exercised certain procedural rights pursuant to the 2009-10 Honor Code.

66. For example, Plaintiff could have contested DEFENDANT HART's authority to make a finding of Honor Code violations by noting that such a finding could only be made by the Committee on Discipline following his receipt of a signed written complaint and a "fair and unbiased hearing."

67. Plaintiff ultimately chose to surrender these rights in exchange for certain benefits, including the following representation made by DEFENDANT HART about how Plaintiff's departure from the College would be noted on his transcript: "A notation of 'W' will appear on your transcript for each of your spring semester

courses and will not figure into the computation of your grade point average."

(*Id.*)

68.    Upon information and belief, STUDENT A was made aware of the sanctions imposed by DEFENDANT HART and did not object to them or file an appeal with the President of the College alleging procedural error or challenging the appropriateness of the sanctions.

***Plaintiff's Return to Amherst and Behavioral Contract***

69.    On or about July 26, 2010, Plaintiff sent a letter to DEFENDANTS HART and TULEJA requesting permission "to return to Amherst in the fall semester." (**Ex. E**, Letter from Plaintiff to Allen Hart & Frances Tuleja (July 26, 2010).)

70.    Plaintiff was not permitted to do so.

71.    During the nine months he ended up spending in South Africa, Plaintiff complied with the conditions of his medical leave and at the end of 2010 was readmitted to the DEFENDANT COLLEGE having demonstrated his readiness to resume full-time study there.

72.    On or about January 11, 2011, DEFENDANT HART sent Plaintiff a letter with the subject matter heading: "Return to Amherst; Behavioral Contract." (**Ex. F**, Letter from Allen J. Hart (Jan. 11, 2011).)

73.    After advising Plaintiff when he could access campus housing, DEFENDANT HART drew attention to "the complex set of circumstances involved" in his departure. (*Id.*)

74. "[I]n an effort to ensure [Plaintiff's] successful re-entry into the Amherst community," DEFENDANT HART stated that a "set of behavioral conditions [had] been established and must be met." (*Id.*)

75. These conditions required Plaintiff to: (a) "remain on probation through graduation"; (b) obtain counseling and allow the Dean's office to monitor it; (c) meet weekly with a Dean and the Assistant Director of Health Education; (d) accept restricted access to certain residence halls; (e) leave campus "during times when the college is officially closed"; and (f) "not initiate contact with [his] former roommate, [STUDENT A]." (*Id.*)

76. DEFENDANT HART concluded the letter by warning Plaintiff that "any breech of this contract AND/OR ANY VIOLATION OF THE AMHERST COLLEGE HONOR CODE may result in *further disciplinary action* . . . up to, and including dismissal." (*Id.* (emphasis added).)

77. In order to be re-admitted as member of the Class of 2014, Plaintiff had to sign the letter thereby acknowledging his "receipt and agreement of these conditions." (*Id.*)

### Amherst College and the Office of Civil Rights

78. On April 4, 2011, the Office of Civil Rights for the U.S. Department of Education ("OCR") sent a so-called "Dear Colleague Letter" to the DEFENDANT COLLEGE and every American educational institution that accepts federal funds explaining "the specific Title IX requirements applicable to sexual violence."[1]

---

[1] Letter from Russlynn Ali, Ass't Sec. for Civil Rights (Apr. 4, 2011) [hereinafter "Dear Colleague Letter"], *available at*

79. This OCR directive has been interpreted by the DEFENDANT COLLEGE as "add[ing] significantly to the responsibilities of educational institutions with respect to the problem of sexual misconduct."  (**Ex. G**, Special Oversight Committee on Sexual Misconduct, "Toward a Culture of Respect: The Problem of Sexual Misconduct at Amherst College," Preamble vi-vii (Jan. 30, 2013) [Hereinafter "OCSM Report"].

80. On October 17, 2012, Angie Epifano, one of Plaintiff's former classmates, published an essay in the school newspaper documenting her rape and the college's flawed response to it.[2]

81. The essay "drew more than 100,000 views on the first day, crashing the server."[3]

82. The following day, DEFENDANT CAROLYN "BIDDY" MARTIN, acting in her capacity of the College's President, released a statement in response to the article, which contained these remarks:

> Every student should feel that the College will treat sexual misconduct and violence with the utmost seriousness. *Every student should know that the failure to respect the integrity of others will result in punitive action.*  We will do what it takes to build confidence in the College's approach.[4]

---

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (last visited June 13, 2014).

[2] *See* Angie Epifano, "An Account of Sexual Assault at Amherst College" *Amherst Student* (Oct. 17, 2012), *available at* http://amherststudent.amherst.edu/?q=article/2012/10/17/account-sexual-assault-amherst-college (last visited June 6, 2012).)

[3] Richard Perez-Pena, "Student's Account Has Rape in Spotlight, N.Y. TIMES (Oct. 26, 2012).

[4] "President Martin's Statement on Sexual Assault" (Oct. 18, 2012) (emphasis added), *available at* https://www.amherst.edu/campuslife/letters_president/node/436469 (last visited June 6, 2014).)

83.   A Special Oversight Committee on Sexual Misconduct at Amherst College

("OCSM") was subsequently "charged with making recommendations to

President Martin for improvement in the College's efforts to prevent and address

sexual assault on campus, and to advise the President as she seeks immediate

changes."  (OCSM Report, Appendix – Charge to the Committee.)

84.   On November 5, 2012, the family of a deceased former student, Trey Malone,

published the note he left when he committed suicide on June 17, 2012.[5]

85.   In his suicide note, Malone stated that he was sexually assaulted by another

Amherst student and described the College's handling of the investigation as an

"emotionless hand washing."[6]

86.   Malone was particularly critical of DEFENDANT MARTIN.[7]

87.   During a meeting with her concerning the assault in December of 2011, Malone

claimed that the first question she asked him was: "Have you handled your

drinking problem?"[8]

88.   On January 30, 2013, the OCSM issued its report.

89.   In the Preamble, the OCSM Report states: "There is a deep residue of misery and

unresolved trauma—sometimes made worse by official disregard—that has

---

[5] *See* Jack Flynn, "Amherst College student Trey Malone's suicide increases pressure for
sexual abuse reforms," Masslive (Nov. 25, 2012), *available at*
http://www.masslive.com/news/index.ssf/2012/11/amherst_college_students_suici.html
(last visited June 7, 2014).

[6] (*Id.*)

[7] (*Id.*)

[8] (*Id.*)

surrounded th[e] issue [of sexual misconduct] for generations, that has damaged

the lives of real individuals, and that cannot simply be wished away or

retrospectively made right." (OCSM Report, Preamble at vi.)

90.   The OCSM Report goes on to note the complexity of the problems posed by

sexual misconduct and states that, "Race complicates the situation still further."

(*Id.* at 21.)

91.   Specifically, the OCSM Report states that:

> Many students of color, both male and female, and some
> international students, believe that the College takes a more
> punitive attitude toward non-white perpetrators, especially
> if the victim is white. According to this view, white
> perpetrators pay for expensive lawyers to get them off, or
> get the College to intervene on their behalf and are never
> expelled or even particularly severely sanctioned. Students
> of color or international students, by contrast, "get the book
> thrown at them."

(*Id.*)

92.   The Report goes on to note that "[s]omewhat similar concerns were voiced by

some students in the LGBT community, who were concerned that homophobia

might lead some students to misrepresent a verbal proposition as a violent sexual

assault, or that the Hearing Board would be inclined to treat allegations about

homosexual sexual misconduct more harshly than other kinds." (*Id.*)

93.   In the summer of 2013, the College published a Student Handbook for upcoming

academic year with a very different Honor Code than the one contained in the

2009-10 version. (*See* **Ex. H**, *2013-14 Student Handbook.*)

94. Whereas the former version featured a single four-page appendix pertaining to sexual misconduct, the 2013-14 version devoted twenty-six pages and two appendices to this issue.  (*Id.*)

95. While the 2013-14 Honor Code continued to encourage members of the College community to "exercise their best will and seek to resolve disagreements as amicably or informally as possible," it announced that the College would no longer make the "Dean of Students Office . . . available to help reach . . . informal resolutions" in "some cases, such as complaints of sexual misconduct."  (*Id.* at 12.)

96. That fall, Epifano and another former Amherst student filed federal complaints against the College "alleging that administrators trivialized their sexual assault reports."[9]

97. In response, DEFENDANT MARTIN praised the courageousness of the complainants and proclaimed that the College had made "much-needed changes" to address "a range of problems in our previous efforts to prevent and respond to incidents of sexual misconduct and assault."[10]

---

[9] Shaina Mishkin & Daniel Rodriguez, "Amherst College facing 2 sexual assault complaints," BOSTON GLOBE (Nov. 16, 2013).

[10] Tyler Kingkade, "Amherst, Vanderbilt Accused Of Botching Sexual Assault Complaints" Huffington Post (Nov. 14, 2013), http://www.huffingtonpost.com/2013/11/14/amherst-vanderbilt-sexual-assault_n_4271138.html?utm_hp_ref=college (last visited June 6, 2014).

98. In December of 2013, DEFENDANT LAURIE FRANKL became the College's first full-time Title IX Coordinator.[11]

99. According to DEFENDANT FRANKL, her "hire represents President Martin's unwavering commitment to addressing the way Amherst manages gender equity issues, including, of course, sexual misconduct allegations."[12]

100. Outgoing Title IX Coordinator DEFENDANT SUZANNE COFFEY stated that "work" with respect to "responding to reports of sexual misconduct and assault" and "taking appropriate steps to eliminate the misconduct" remained "ongoing."[13]

101. During DEFENDANT FRANKL's first day on the job, one of the complainant's in the federal complaint against the College was quoted in the student newspaper as advocating for the implementation of a policy whereby e-mails would be sent to the entire student body after an anonymous report of sexual misconduct is filed.[14]

---

[11] Elaine Vilorio, "College Hires Full-Time Title IX Coordinator," *Amherst Student* (Nov. 20, 2013), *available at* http://amherststudent.amherst.edu/?q=article/2013/11/20/college-hires-full-time-title-ix-coordinator (last visited June 7, 2013).

[12] Sophie Murguia, "College Accused of Mishandling Sexual Assault," *The Amherst Student* (Dec. 4, 2013), *available at* http://amherststudent.amherst.edu/?q=article/2013/12/04/college-accused-mishandling-sexual-assault (last visited June 12, 2014).

[13] (*Id.*)

[14] (*Id.*)

102.  Over the winter break, students received an e-mail from Frankl informing them "that an Amherst student had been accused of sexual misconduct, found guilty by a hearing board and sanctioned with expulsion from the school."[15]

103.  In this e-mail, DEFENDANT FRANKL stated that the College had decided to begin "notify[ing] the community when a student has been expelled for committing sexual violence."[16]

104.  On April 29, 2014, OCR published a forty-six page document entitled, "Questions and Answers on Title IX and Sexual Violence."[17]

105.  Two days later, on May 1, 2014, OCR released a list identifying Amherst as one of fifty-five colleges and university being investigated for possible violations of federal law over the handling of sexual violence and harassment.[18]

106.  A spokesperson for the DEFENDANT COLLEGE released a statement professing that the College remains "deeply [*sic*] deeply committed to meeting all

---

[15] "Amherst expels first student in a decade for sexual misconduct," *Mt. Holyoke News* (Feb. 6, 2014), *available at* http://mountholyokenews.org/2014/02/06/amherst-expels-first-student-in-a-decade-for-sexual-misconduct/ (last visited June 7, 2014).

[16] Sophie Murguia, "Expulsion Draws Focus to New Title IX Policies," *Amherst Student* (Jan. 29, 2014), *available at* http://amherststudent.amherst.edu/?q=article/2014/01/29/expulsion-draws-focus-new-title-ix-policies (last visited June 7, 2014).

[17] OCR, "Questions and Answers on Title IX and Sexual Violence," (Apr. 29, 2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (last visited June 19, 2014).

[18] *See* Rebecca Everett, "Amherst College, UMass Amherst among colleges and universities being investigated by the US Dept. of Education over handling of sexual abuse," DAILY HAMPSHIRE GAZETTE (May 1, 2014).

the requirements of federal law and, more than that, holding ourselves to the highest-possible standards in meeting the needs of our students."[19]

***Plaintiff's Successful Re-Entry***

107. Meanwhile, by any conceivable measure, Plaintiff thrived upon his return to Amherst.

108. In January, 2011, he became a contributing writer for a student journal and resumed work as a language tutor and media developer for the Five College Center for the study of World Languages.

109. In the summer of 2012, Plaintiff achieved fluency in his fourth language by attending the Middlebury College French School summer immersion session.

110. After spending the spring of 2013 studying abroad in France, Plaintiff became the Business Manager for the Amherst College Zumbyes, a popular student a cappella group.

111. In the summer before his senior year, the DEFENDANT COLLEGE's Office of Admission hired Plaintiff as an intern to lead tours, conduct information sessions, and tele-mentor college applicants.

112. Entering his last semester as an Amherst College Student, Plaintiff carried a cumulative grade point average of 3.66.

---

[19] WGGB/AP "Amherst, UMass Among 55 Colleges Facing Sex Assault Investigations," (May 1, 2014), *available at* http://www.wggb.com/2014/05/01/ed-dept-55-colleges-face-sex-assault-investigations/ (last visited June 7, 2014).

113. Upon completion of his thesis, Professors in the Department of Law, Jurisprudence and Social Thought (LJST) stood ready to award Plaintiff a degree *magna cum laude*.

114. Plaintiff also completed the coursework necessary to receive a second degree in French.

**The Green Dean Fellowship**

115. While serving as an intern in the Office of Admission during the summer of 2013, Plaintiff became aware that the office offered a small number of fellowships to graduating seniors known as "Green Deans" positions.

116. These fellows serve as part of the twelve-member Admission Committee, make public presentations on campus, travel to high schools and college fairs across the country, evaluate applications, and contribute to admission decisions.

117. Once Plaintiff became reasonably certain that a Green Dean fellowship would permit him to remain in the country another year for "Optional Practical Training" (OPT) as part of his F-1 Study VISA, he applied for the position and was offered one.

118. On April 7, 2014, Plaintiff sent an e-mail to Dean of Admission Katie Fretwell and Associate Dean of Admission Michael Hawkins declaring his readiness to join "The best Admissions team in the world."  (**Ex. I**, E-mail from Plaintiff to Katie Fretwell & Michael Hawkins (Apr. 7, 2013).)

119. Although the official start date for the position was July 1, 2014, two days later, Plaintiff represented the College at a reception in Boston for accepted students. (*See* **Ex. J**, E-mail exchange between Katie Fretwell & Plaintiff (Apr. 8, 2014).)

120. On May 12, 2014, Plaintiff and the two other incoming Admissions "Green

Deans" received an e-mail from an DEFENDANT TULEJA in her capacity as

Associate Dean of Admission.  (**Ex. K**, E-mail from Frances Tuleja (May 12,

2014).)

121. The e-mail began this way:

> I know that you must all be crazy busy finishing up the last
> papers and exams of your college careers, but I'm writing
> to you now about something that is *really* important….
> Your new business cards!!!!  Yes, in addition to a real
> salary and world travel, one of the major perks of your
> Admission Fellow gig is getting super-duper business cards
> of your very own!

(*Id.* (emphasis in original).)

122. As noted above, before joining the Office of Admissions, DEFENDANT

TULEJA served as the College's Dean for Student Conduct and Title IX

Coordinator and directly participated in the investigation of sexual assault

Plaintiff allegedly perpetrated some four and a half years before.

### *Withholding the Degree and Rescinding the Job Offer*

123. At 11:26 on Friday morning, May 16, 2014, DEFENDANT FRANKL sent

Plaintiff an e-mail requesting that he contact her to "discuss an urgent matter."

(**Ex. L**, E-mail exchange between Laurie Frankl & Plaintiff (May 16, 2014).)

124. At 1:48 pm, Plaintiff responded by telling DEFENDANT FRANKL that he had

tried unsuccessfully to reach her via Skpe and was about to take the last final

exam of his college career.  (*Id.*)

125. "Your e-mail has made me very anxious," Plaintiff wrote.  "I haven't a clue what

this could be about."  (*Id.*)

126. At the conclusion of his exam, Plaintiff walked out the door and found Torin
     Moore, an Assistant Dean of Students and Director of Residential Life, waiting to
     escort him to the Office of Student Affairs.

127. Asked by Plaintiff what was going on, Moore replied that he had no idea and was
     simply following some unspecified person's instructions.

128. At the Office of Student Affairs, DEFENDANT FRANKL and Interim Dean of
     Students Charri Boykin-East informed Plaintiff that STUDENT A had recently
     called the College to express dissatisfaction with the handling of the 2009
     incident.

129. During this meeting, Plaintiff was advised that the case was being referred to the
     Sexual Misconduct Hearing Board, and that the College had already procured an
     investigator to investigate the complaint filed by the College on behalf of itself;
     an amended complaint was subsequently filed which identified DEFENDANT
     SUSIE MITTON SHANNON as the complainant.

130. Plaintiff was also told that in light of his status as a second-semester senior, the
     College had chosen to exercise its discretion to withhold his degree pending the
     outcome of the student conduct proceedings.

131. These decisions by officials at the DEFENDANT COLLEGE were in
     contravention of Plaintiff's reasonable expectations, thereby violating the
     DEFENDANT COLLEGE'S contract with him.

132. These decisions by officials at the DEFENDANT COLLEGE failed to afford
     Plaintiff his right to a disciplinary process that it is conducted with basic fairness.

133.   Upon information and belief, no white student at the DEFENDANT COLLEGE
       placed on probation, and subjected to other disciplinary measures, for a violation
       of the Honor Code has ever been subjected to additional penalties for the
       underlying incident absent a violation of said probation.

134.   Upon information and belief, no female student at the DEFENDANT COLLEGE
       placed on probation, and subjected to other disciplinary measures, for a violation
       of the Honor Code has ever been subjected to additional penalties for the
       underlying incident absent a violation of said probation.

135.   Upon information and belief, no heterosexual student at the DEFENDANT
       COLLEGE placed on probation, and subjected to other disciplinary measures, for
       a violation of the Honor Code has ever been subjected to additional penalties for
       the underlying incident absent a violation of said probation.

136.   Upon information and belief, no U.S. American student at the DEFENDANT
       COLLEGE placed on probation, and subjected to other disciplinary measures, for
       a violation of the Honor Code has ever been subjected to additional penalties for
       the underlying incident absent a violation of said probation.

137.   Upon information and belief, intentional discrimination on the basis of Plaintiff's
       race, sex, sexual orientation, and/or national origin served as substantial or
       motivating factors for the actions these decisions taken by officials at the
       DEFENDANT COLLEGE.

138.   Over the course of the next several days, Plaintiff made repeated demands that
       DEFENDANT FRANKL disclose the identity of the official who had decided to
       withhold his degree.

139. DEFENDANT FRANKL eventually called the Registrar who agreed to meet with Plaintiff on May 21, 2014.

140. When Plaintiff showed up for this meeting, DEFENDANT COFFEY was present and appeared to be the official in charge.  (*See* **Ex. M**, E-mail exchange between Plaintiff & Suzanne Coffey (May 21, 2014).)

141. Among other things, Plaintiff told DEFENDANT COFFEY that it was imperative that he receive a degree because he could not begin working as a Green Dean without one.

142. While DEFENDANT COFFEY acknowledged the procedural irregularities in the case, she claimed that such concerns could only be addressed at the Sexual Misconduct Board Hearing and refused to reconsider the decision to withhold Plaintiff's degree.

143. Plaintiff was not permitted to participate in the commencement ceremony that took place on May 25, 2014, and could not bring himself to attend in light of the many questions he knew he would have to field from friends and acquaintances.

144. On or about May 28, 2014, Plaintiff received a call from Fretwell advising him that she had no choice but to rescind the fellowship offer based on the potential danger he posed to teen-age applicants.

145. Plaintiff followed-up with an e-mail explaining that while he did not hold Fretwell responsible for this decision, it was nevertheless "the wrong decision for numerous reasons, most important among which are perhaps the fact[s] that I have not been found responsible for the alleged infraction and . . . would make a

great Green Dean who would not endanger applicants." (**Ex. N**, E-mail exchange between Plaintiff & Katie Fretwell (May 29 – June 2, 2014).)

146. In her response, Fretwell stated that she had explored the possibility not rescinding the fellowship offer unless or until Plaintiff was found guilty of the alleged sexual assault. (*Id.*)

147. Raising this possibility caused Fretwell's superiors to inform her that "this decision does not rest solely on the circumstances being examined right now but ultimately weighs a number of behaviors dating back to [Plaintiff's] early time at Amherst." (*Id.*)

148. According to Fretwell, "To protect [Plaintiff's] privacy, the details of these behaviors [had] not been shared with [her]." (*Id.*)

149. Upon information and belief, one or more the INDIVIDUAL DEFENDANTS apprised Fretwell of Plaintiff's past disciplinary history for purposes of interfering with his position with the Office of Admissions.

150. At the time officials at the DEFENDANT COLLEGE decided to rescind the fellowship offer, Plaintiff either had a history of, or had been misclassified as having, physical and/or mental impairment(s) that substantially limited at least one major life activity.

151. At the time officials at the DEFENDANT COLLEGE decided to rescind the fellowship offer, Plaintiff was regarded as having such an impairment or impairments by the DEFENDANT COLLEGE.

152. At the time officials at the DEFENDANT COLLEGE decided to rescind the fellowship offer, Plaintiff could perform the essential functions of the Green Dean

position, with or without reasonable accommodation, and did not pose a direct

threat to others.

153. The decision by officials at the DEFENDANT COLLEGE to rescind the

fellowship offer was an adverse action taken against Plaintiff, in whole or in part,

because of his disability and/or handicap, as these terms have been defined by

federal and state law.

*Correspondence with President Martin*

154. On or about May 29, 2014, Plaintiff wrote DEFENDANT MARTIN an e-mail

detailing the fundamentally unfair actions of the College. (**Ex. O**, E-Mail from

Plaintiff to Biddy Martin (May 29, 2014).)

155. On or about May 31, 2014, DEFENDANT MARTIN provided the following

response:

> Dear [Plaintiff]:
>
> Thank you for your letter.  This is clearly and
> understandably a very difficult time for you.  I am sorry
> that it is.  Let me explain the College's reasoning for
> bringing the sexual misconduct complaint against you now.
>
> As you know, a report of sexual assault was brought
> forward by your former roommate in December of 2009.
> Recently, the College's Title IX Coordinator, Laurie
> Frankl, was made aware of that 2009 report and undertook
> a review of the record.  As a result of that review, she
> discovered that the College failed in 2009 to comply with
> Title IX law and with the Student Handbook.  The College
> had an obligation then, as it does now, to investigate all
> reports of sexual misconduct and to establish a process that
> would yield a finding of fact and, if appropriate, a
> disciplinary sanction.
>
> As I think you know, there was never a formal process for
> determining the facts of the matter in response to the 2009
> report.  The medical or rehabilitative leave to which you

agreed back then is not a substitute for an investigation and adjudication of the report that was brought forward. A medical leave for the purpose of getting help with your alcohol use and personal problems was not a disciplinary action, as discipline is defined in our code and the leave, therefore, did not satisfy the requirements under Title IX law or even our own student handbook for responses to allegations of sexual assault.

When the absence of a formal process recently came to our attention, the College had no choice but to remedy the situation by beginning a formal investigation and process of adjudication. As you know, there is no statute of limitations for the reporting of sexual assault.

Let me call your attention to relevant passages in the Student Handbook. It required the College to "seriously and thoroughly investigate any complaint of sexual harassment (which we know to include sexual violence) and to discipline those found guilty." The College did not meet this responsibility. Your medical leave was an agreed-to rehabilitative remedy with no attendant investigation or grievance process.

Further, pursuant to the 2009–2010 Student Handbook, had your medical leave been a disciplinary action, a penalty of more than one semester would have required referral to a Hearing Board. As you know, your case was not referred to a Hearing Board. An involuntary medical leave did not involve that requirement.

Finally, the 2009-2010 Student Handbook was clear that disciplinary sanctions were to be recorded on a student's transcript. The 2009-2010 Student Handbook reads, "any student found under the provisions of this Code to have committed violence against another person will normally be dismissed from the college for a period no shorter than one semester and will have recorded on his or her transcript the fact and length of the dismissal." You have no notation of discipline on your transcript, because your medical leave was not a disciplinary action.

I certainly appreciate that you experienced the medical leave as discipline. As you point out, the form letter you received about your return to campus makes reference to

possible further "disciplinary actions," for example, and
you were told you were on probation upon your return.

Errors in the handling of the case in 2009 have brought us
to this painful point and I apologize to you for the problems
with the way the 2009 report was handled.  However, now
that we are aware of the failures to follow relevant law and
policy at the time we have no choice but to comply with the
law and our own policies.  A review of your file and a
careful reading of the Amherst College 2009-2010 Student
Handbook makes clear not only that the charges against
you were never put to a process for hearing and disposition,
but also that you were never sanctioned with discipline as it
was defined by our Code.

This information will do little to comfort you in this time of
confusion, uncertainly, and understandable distress, but I
hope it provides some clarity about the circumstances you
now face.  I would be happy to meet with you once the
hearing has occurred, if that would be helpful at that time.

Sincerely,

Biddy Martin

(**Ex. P**, E-mail from Biddy Martin to Plaintiff (May 31, 2014).)

### *The Immigration, Health, and Housing Consequences of Defendants' Actions*

156. As noted above, after accepting the Green Dean position, Plaintiff applied for

post-completion OPT status.

157. A student granted OPT status is permitted to work in a field related to what the

student has studied for a total of twelve (12) months without sponsorship and

without applying for a work (HB1) VISA.

158. The 12-month period is attached to the F-1 study VISA.

159. When Plaintiff submitted his application for the OPT work authorization in April,

he cited the Amherst College Office of Admission as his employer.

160. On or about June 5, 2014, Plaintiff learned that his application had been approved.

161. If Plaintiff does not get the Admission job back, he will have a total of ninety (90) days from the last day of the most recent semester to find other suitable employment before the OPT has to be cancelled.

162. On or about June 10, 2014, Plaintiff attempted to access his account on *ACData*, the DEFENDANT COLLEGE's internal information system.

163. *ACData* did not permit Plaintiff to access his academic history in the form of an unofficial transcript for purposes of either computing his grade point average or demonstrating to prospective employers the coursework he has completed.

164. Since May 16, 2014, Plaintiff has suffered emotional distress featuring physical harm manifested by objective symptomatology.

165. Among other things, Plaintiff has had difficulty sleeping and eating and has been depressed.

166. Plaintiff is currently medication to prevent the recurrence of seizures he has experienced during times of stress.

167. On June 1, 2014, Plaintiff was forced to leave campus housing.

168. Before the College decided to withhold his degree and withdraw his employment offer, it had been Plaintiff's intention to secure a loan to pay the first and last months' rent and security deposit on an apartment.

169. Without the Green Dean job – or an Amherst degree that would permit him to find comparable employment – Plaintiff has not been able to get a loan to obtain the funds necessary to rent an apartment.

170. Since June 1, 2014, he has stayed with a friend whose lease does not permit long-term guests.

### *The Impending Hearing Before the Sexual Misconduct Hearing Board*

171. On June 11, 2014, Plaintiff received the "REPORT OF INVESTIGATION OF

SEXUAL MISCONDUCT" that will be provided to Sexual Misconduct Hearing

Board.

172. At the outset of the report, the investigator notes that DEFENDANTS HART and

TULEJA were among the persons who she interviewed but information derived

from these interviews were not included in the report because it "was determined

not to be probative of the allegations in the complaint."

173. Attached to the investigator's report is a copy of the letter from DEFENDANT

HART to Plaintiff dated March 31, 2014.

174. The version of this letter that will be presented to the Hearing Board is heavily

redacted; it does not reflect DEFENDANT HART'S determination that Plaintiff

"violated the Honor Code" and creates the erroneous impression that Plaintiff's

"medical leave" was a voluntary decision on his part.

175. The Behavioral Contact Plaintiff was forced to sign to resume studying at the

DEFENDANT COLLEGE is not among the exhibits that will be provided to the

Hearing Board.

176. The investigator's report concludes with a summary of the investigator's

"impressions."

177. Among other things, the investigator opines that: (i) STUDENT A's "statements

were detailed and consistent and did not appear to be embellished or exaggerated"

and (ii) STUDENT A's "emotional distress immediately after the events of

December 19 also corroborates his claim that he did not consent to any sexual

activity."

178. DEFENDANT SUZANNE COFFEY has been designated to serve as the

Chairperson of the Sexual Misconduct Hearing Board.

179.  On June 24, 2014, DEFENDANT FRANKL wrote Plaintiff an email advising

him that the College was "ready to convene a Hearing Board in [his] case" and

asking about Plaintiff's availability on "July 10, 11, 14, 15, and 16."


**CLAIMS FOR RELIEF**

COUNT I – BREACH OF CONTRACT – *Student Handbook*
(Defendant College)

180. Plaintiff hereby incorporates and adopts each and every allegation in the

preceding paragraphs numbered 1 through 179.

181. The relationship between students and private colleges is contractual in nature,

and each party to the contract owes to the other certain duties, some of which are

enumerated in the *2009-10 Student Handbook*.

182. DEFENDANT COLLEGE has breached its obligations to Plaintiff under this

contractual arrangement and Plaintiff has been, and continues to be, damaged by

this breach.

183. In addition, DEFENDANT COLLEGE has failed to honor its obligation of good

faith and fair dealing imputed in each contract entered into in the Commonwealth

of Massachusetts.

184. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

## COUNT II – DUTY OF BASIC FAIRNESS
### (Defendant College)

185. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

186. Private colleges have an obligation to ensure that the disciplinary processes to which they subject students are conducted with basic fairness.

187. DEFENDANT COLLEGE has breached this duty of basic fairness to Plaintiff and Plaintiff has been, and continues to be, damaged by this breach.

188. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

## COUNT III – BREACH OF CONTRACT – Green Dean Fellowship
### (Defendant College)

189. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

190. DEFENDANT COLLEGE, through its Office of Admission, made an employment offer to Plaintiff which Plaintiff accepted and relied upon to his detriment.

191. DEFENDANT COLLEGE has breached its obligations to Plaintiff under this contractual arrangement and Plaintiff has been, and continues to be, damaged by this breach.

192. In addition, DEFENDANT COLLEGE has failed to honor its obligation of good faith and fair dealing imputed in each contract entered into in the Commonwealth of Massachusetts.

193. As a direct and proximate result of these acts and omissions Plaintiff has suffered and continues to suffer the harms and damages as described above.

COUNT IV – 42 U.S.C. § 2000d
(Defendant College)

194. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

195. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

196. The above-described actions on the part of the DEFENDANT COLLEGE constituted intentional discrimination on the basis of Plaintiff's race, color and/or national origin in violation of Title VI.

197. As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.

### COUNT V – 42 U.S.C. § 1981
### (All Defendants)

198. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

199. Section 1981 provides, *inter alia*, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

200. The above-described actions on the part of DEFENDANTS constituted intentional discrimination on the basis of Plaintiff's race in violation of Section 1981.

201. As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.

### COUNT VI – 20 U.S.C. § 1681
### (Defendant College)

202. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

203. Pursuant to Title IX of the Education Amendments of 1972, Plaintiff has a right not to be subjected to university discipline where sex is a motivating factor in the decision to enforce Honor Code regulations and impose sanctions.

204. DEFENDANT COLLEGE violated Plaintiff's statutory right to be free from discrimination on the basis of sex by selectively enforcing provisions set forth in

the Honor Code despite the fact he had already been placed on probation, and

subjected to other disciplinary measures, for the same alleged misconduct.

205. As a direct and proximate result of these acts and omissions, Plaintiff has suffered

and continues to suffer the harms and damages as described above.


COUNT VII – 29 U.S.C. § 794
(Defendant College)

206. Plaintiff hereby incorporates and adopts each and every allegation in the

preceding paragraphs numbered 1 through 179.

207. Section 504 of the Rehabilitation Act of 1973 prohibits recipients of federal

assistance from discriminating against handicapped individuals.

208. DEFENDANT COLLEGE violated Plaintiff's statutory right to be free from such

discrimination by rescinding the fellowship offer previously extended to him.

209. At the time DEFENDANT COLLEGE took the above-described actions, Plaintiff

either had a history of, or had been misclassified as having, physical and/or

mental impairment(s) that substantially limited at least one major life activity.

210. At the time the DEFENDANT COLLEGE took the above-described actions,

Plaintiff was regarded as having such an impairment or impairments by the

DEFENDANT COLLEGE.

211. At the time the DEFENDANT COLLEGE took the above-described actions,

Plaintiff could perform the essential functions of the Green Dean position, with or

without reasonable accommodation, and did not pose a direct threat to others.

212. The decision by the DEFENDANT COLLEGE to rescind the fellowship offer was an adverse action taken against Plaintiff, in whole or in part, because of his handicap, as that term is defined by the Rehabilitation Act.

213. As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.


COUNT VIII – Intentional Interference with Advantageous Business Relations
(Individual Defendants)


214. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

215. Under Massachusetts law, a person may not intentionally interfere with the advantageous business relations of another.

216. The INDIVIDUAL DEFENDANTS were aware of the existence of a business relationship which contemplated economic benefit to Plaintiff and intentionally interfered with that business relationship for an improper purpose and/or by improper means thereby causing Plaintiff damages.

217. As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.


COUNT IX – Intentional Infliction of Emotional Distress.
(Individual Defendants)

218. Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

219.  Under Massachusetts, a person may not intentionally inflict emotional distress upon another.

220.  The above-described actions on the part of the INDIVIDUAL DEFENDANTS were extreme and outrageous, beyond all possible bounds of decency, and are utterly intolerable in a civilized community.

221.  The INDIVIDUAL DEFENDANTS knew or should have known that emotional distress was the likely result of their conduct.

222.  The above-described actions on the part of the INDIVIDUAL DEFENDANTS were the cause of an emotional distress sustained by Plaintiff that was severe and of a nature that no reasonable person could be expected to endure it.

223.  As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.


COUNT X – Negligent Infliction of Emotional Distress.
(Individual Defendants)

224.  Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 179.

225.  Under Massachusetts, a person may not negligently inflict emotional distress upon another.

226.  By their negligence exhibited in the above-described actions, the INDIVIDUAL DEFENDANTS caused Plaintiff emotional distress that has featured physical harm manifested by objective symptomatology.

227. The emotional stress Plaintiff has experienced as a result of above-described actions by the INDIVIDUAL DEFENDANTS is consistent with what a reasonable person would have suffered under the circumstances set forth above.

228. As a direct and proximate result of these acts and omissions, Plaintiff has suffered and continues to suffer the harms and damages as described above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint.  Plaintiff further requests that this Court:

A.      Issue an injunction permanently enjoining Defendants, Defendants' agents, employees and all persons in active concert or participation with them, from violating Plaintiff's rights by commencing with the aforementioned Sexual Misconduct Hearing Board.

B.      Retain jurisdiction of this matter for the purpose of enforcing this Court's order.

C.      Award to Plaintiff compensatory damages in an amount to be determined at trial.

D.      Award Plaintiff the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988.

E.      Grant such other and further relief as this Court deems equitable and just under the circumstances.

*       *       *       *       *       *       *

PLAINTIFF DEMANDS A TRIAL BY JURY

**THE PLAINTIFF**


By:  _____/s/ Luke Ryan_____
LUKE RYAN, BBO# 664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]


By:  _____/s/ David Hoose_____
DAVID HOOSE, BBO# 239400
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd Floor
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 [FAX]

**VERIFICATION**

I declare and affirm, under the pains and penalty of perjury, that to the best of my

knowledge the allegations set forth above are true and correct.


_/s/ John Doe_____
 JOHN DOE

Dated: 6/24/14