UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,

     Plaintiff,

     v.

AMHERST COLLEGE, CAROLYN "BIDDY"
MARTIN, SUZANNE COFFEY, ALLEN HART,
FRANCES TULEJA, LAURIE FRANKL and
SUSIE MITTON SHANNON,

     Defendants.

C.A. No. 3:14-cv-30114-MGM

**LEAVE TO FILE BRIEF IN EXCESS
OF TWENTY (20) PAGES GRANTED
ON JULY 11, 2011**

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION</u>**

     The perpetrator of an alleged sexual assault at Amherst College seeks to walk away, diploma in hand, without any formal adjudication of the charges against him, while the former student who experienced the assault continues to struggle with the emotional harm he reportedly caused.

     This case arises out of a sexual encounter between plaintiff John Doe and Student A at the end of the fall semester of 2009, when both were students at Amherst College. Doe alleges that their encounter was consensual. Student A tells a different story, asserting that he was raped after months of rebuffing Doe's unwanted sexual advances.

     Faced with this dispute, Amherst has scheduled a hearing before its Sexual Misconduct Hearing Board to evaluate these competing versions and, as best as possible, to ascertain the truth of what occurred, in compliance not only with Amherst's policies, but with the college's obligations under federal law. Doe, however, does not want the hearing to go forward, claiming that Student A's allegations were "informally" resolved by the College years ago and that

Amherst is contractually barred from pursuing disciplinary proceedings.  For this reason, he asks this Court for an order barring Amherst from holding the hearing.

The relief that Doe is seeking is not only extraordinary and extraordinarily unjustified, it is literally unprecedented.   Although Massachusetts law strongly and consistently cautions courts against encroaching into the sensitive area of the student-college relationship, especially in the area of discipline, Doe nonetheless asks this Court to charge headlong into the fray and halt the internal disciplinary proceeding of a private college arising from allegations of sexual assault.  Not surprisingly, he points to no other case in which any other court has ever done what he now asks this Court to do.

Doe has failed to carry his burden of establishing that this Court should intervene into Amherst's internal affairs. He has not demonstrated a likelihood of success on the merits, or that the extreme and drastic remedy of a preliminary injunction is warranted in any way.  His claims of potential harm are entirely speculative and not remotely irreparable.   And, perhaps most importantly, his request to bar Amherst from adjudicating allegations of sexual assault runs afoul of overwhelming public policy designed to eliminate sexual violence on college campuses across the nation.  For these reasons, Doe's request for a preliminary injunction should be denied.

## <u>STATEMENT OF RELEVANT ALLEGATIONS</u>

### *Student A's Allegations: Fall 2009 through Spring 2011*

Doe has provided his version of events to this Court.  This is what Student A says happened.[1]

In the fall of 2009, Student A and Doe shared a double suite at Amherst, with each having his own room.  Declaration of Student A ("Student A Decl."), ¶1.  On the second night

---

[1]      Doe has filed a Motion to Proceed under Pseudonym and for Protective Order, and the parties' counsel are working to agree upon suitable terms of protection.  In the meantime, they have agreed that Student A may submit his affidavit under a pseudonym.

that they shared the suite, Doe entered Student A's room at approximately 4:00 a.m. while Student A was sleeping and woke him up. *Id.*, ¶2. Doe was very drunk and dressed only in his underwear. Doe began questioning Student A about his sex life and sexual history, and he stated that he wanted to have sex with Student A. Student A told Doe that he was not interested in having sex, and he was able to get Doe to return to his room. *Id.*

On several occasions throughout the fall semester, this scenario was repeated, with Doe entering Student A's room drunk in the middle of the night and stating that he wanted to have sex with him. Each time, Student A said "no" and was able to get Doe to go back to his room. *Id.*, ¶3.

On December 19, 2009, Doe again entered Student A's room in the middle of the night while Student A was sleeping. This time, Doe raped Student A. *Id.*, ¶4.

The next morning, Student A spoke with Pamela Stawasz, Amherst's Area Coordinator for Resident Life Services and LGBTQ liaison, and told her what had happened to him. That day, Ms. Stawasz helped Student A move out of the suite and into a different dormitory. *Id.*, ¶5.

After the holiday break, Student A returned to Amherst for the interterm session in January 2010 to work in the Office of Admission. During that period, Student A repeatedly encountered Doe, which was painful and distressing for Student A. As a result, Student A stopped leaving his dormitory, eating at the dining hall, or going to the student center. *Id.*, ¶7. Doe's assault traumatized Student A and had damaging effects, personally and academically. *Id.*, ¶6.

Although Student A understood that a "no contact" order had been issued, Doe, again drunk, approached Student A at a party in early 2010. *Id.*, ¶¶8, 9.[2] In February 2010, Doe

---

[2] Student A reports that he was apprised of the "no contact" order by Dean Allen Hart, with whom Student A once discussed the December 2009 incident. Student A Decl., ¶8. (Dean Hart was originally Amherst's Dean of

confronted Student A in the laundry room of his new dormitory, positioning himself between

Student A and the doorway.  These encounters were upsetting to Student A, who no longer felt

safe, and he became increasingly isolated and depressed.  *Id.*, ¶¶11, 12.  Student A's emotional

and physical deterioration culminated in his hospitalization and, ultimately, his temporary

withdrawal from Amherst in February 2010.  *Id.*, ¶12.

Student A returned to Amherst in the fall of 2010 after learning that Doe would be away

from campus until the end of that semester.  *Id.*, ¶¶14, 15.[3]  With Doe away, Student A

performed well academically and thrived socially.  *Id.*, ¶15.  As the semester was coming to an

end, however, Student A became increasingly concerned about Doe's impending return.  *Id.*

Doe returned to Amherst in January 2011.  For Student A, Doe's presence triggered

constant memories of what had happened in December 2009.  *Id.*, ¶16.  Student A stopped going

out.  He began having nightmares.  He had eating problems.  He felt unsafe and began missing

classes.  His grades plummeted.  *Id.*[4]

At the end of the summer 2011, Student A decided to leave Amherst for good, believing

that he could not return while Doe was there.  *Id.*, ¶18.

### Doe's Multiple Conduct and Medical Issues

During his freshman year at Amherst, Doe had significant problems with alcohol,

personal issues, and health issues.  A few days into his first semester, a campus police officer

cited Doe for alcohol possession, prompting his referral for alcohol education and assessment.

---

First Year Students, and later Dean of Students.  Verified Complaint, ¶10.)  Dean Hart told Student A that he could
not discuss possible disciplinary actions because of privacy obligations.  *Id.*  Although Student A met with Dean
Hart on other occasions to discuss his academic performance and personal issues, they never again discussed the
alleged sexual assault.  *Id.*  Student A never met or discussed the alleged sexual assault with Amherst's then Title IX
Coordinator, Frances Tuleja.  Student A Decl., ¶13.

[3]        Student A did not know the reason for Doe's departure from campus.  *Id.*, ¶14.

[4]        In May 2011, Doe again approached Student A at an Amherst event, even though he had been directed to
not initiate contact with him.  *Id.*, ¶17; Verified Complaint, Ex. F.  This encounter upset Student A, who felt like
Doe was trying to intimidate him.  *Id.*, ¶17.

Declaration of Scott A. Roberts ("Roberts Decl."), Ex. 1.  In October 2009, Student A expressed concern to Residential Life that Doe (whom he described as "closeted") had "solicited [him] for sex," which was "becoming more of a problem," and that Doe had not "stopped binge drinking" since his second night at Amherst.  Roberts Decl., Ex. 2.  Student A also said that Doe "broke down" in another student's room, and felt that Doe should be referred to the Counseling Center. *Id.*

In November 2009, Doe self-reported to Dean Hart that he had a "mild seizure," resulting in his hospitalization.  Roberts Decl., Ex. 3.  In January 2010, Doe again reported to Dean Hart that he had been admitted to the hospital, this time for a "panic attack . . . due to an excessive build up of some hormones."  Roberts Decl., Ex. 4.

On two separate occasions in March 2010, Doe, while drunk, entered students' rooms without their permission in the middle of the night.  Roberts Decl., Ex. 5.  On the second occasion, Doe (after consuming, in his estimation, 5 or 6 drinks) entered the bedroom of another student at 3:00 a.m.  *Id.*  The other student woke up, chased Doe out of his suite, and called the campus police.  *Id.*  When questioned by campus police officers that morning, Doe became "visibly upset," causing the officers to ask if he needed a counselor.  *Id.*  Doe later explained in a written statement that, "drunk and alone," he had "started to wander around aimlessly…." Roberts Decl., Ex. 6.[5]  On the date of the second incident, John Carter, Amherst's Chief of Campus Police, described Doe's "numerous issues" in an email to a campus police officer, stating:

> This is somewhat confidential, but [Doe] has had numerous issues.  He has health issues, a family member was murdered in S. Africa, has been the victim of a theft of a laptop and most recently is questioning his sexual preference and is suspected of climbing into bed with another student in the middle of the night.

---

[5]    In describing these events in his Verified Complaint, Doe states only that he "entered dormitories where he did not reside and startled inhabitants by his presence."  Verified Complaint, ¶49.

I share this just so you know you are dealing with someone under stress.

Roberts Decl., Ex. 7.

*Doe's Request for a Voluntary Medical Withdrawal*

In March 2010, Doe discussed his conduct and behavioral issues with Dean Hart and Dean Tuleja.  Verified Complaint, ¶50.  In light of those problems, Doe requested a voluntary medical withdrawal.  Verified Complaint, Ex. C.[6]  In a March 31, 2010 letter, Dean Hart told Doe that his conduct "could have resulted in disciplinary action," but Dean Hart nonetheless "granted" Doe's request for a medical withdrawal, stating, "I decided to place you on a medical withdrawal, rather than impose a disciplinary suspension, to allow you the opportunity to address [your personal issues and alcohol use] in a therapeutic, rather than a punitive manner."  *Id.*  Dean Hart told Doe that he would be able to seek readmission to Amherst in the Spring of 2011, assuming that he fulfilled the conditions of his leave.  *Id.*[7]

*Doe's "Behavioral Contract" with Amherst*

In late 2010, Doe apprised Amherst that he wished to return to the College for the upcoming spring semester.  On January 11, 2011, Dean Hart sent a letter to Doe setting forth the "behavioral conditions" that had been established by the College "to ensure [Doe's] successful re-entry into the Amherst community," and stating that Doe would remain on probation through graduation.   Verified Complaint, Ex. F (the "Behavioral Contract").  At the end of that letter, Dean Hart stated that "ANY VIOLATION OF THE AMHERST COLLEGE HONOR CODE

---

[6]      Doe now claims that he was "forced" into taking this medical leave.  As addressed herein, that contention is incorrect and contradicted by Doe's own contemporaneous statements.  *See infra*, pp.15-16.

[7]      Under the policies in effect at Amherst during the 2009/2010 academic year, the College permitted students to take "<u>voluntary withdrawals</u>" to address, among other things, "<u>medical problems</u> … and other factors commonly encountered by students…."  Roberts Decl., Ex. 8 at 68 (emphasis added).  The policy "encourage[d] students to consider carefully their situation … and to <u>decide for themselves</u> whether they should temporarily interrupt their study at the College and take voluntary withdrawals…."  *Id.* at 68-69 (emphasis added).  Students returning from voluntary withdrawals were required to comply with Amherst's policy for readmission.  *Id.*  Dean Hart's March 31, 2010 letter to Doe dovetails with this policy.  *See* Verified Complaint, Ex. C.

may result in further disciplinary actions against you, up to and including dismissal from Amherst College." *Id.*

**In 2014, Student A Requests That the College File a Complaint against Doe**

On May 8, 2014, almost three years after he had left Amherst, Student A learned that Doe had been hired by the College to serve as a "Green Dean" in its Office of Admission.[8]  Student A Decl., ¶19.  Student A reports that he was "terrified" that Doe would be in a position in which he would interact with young, prospective students of Amherst.  *Id.*

On May 9th, prompted by his concerns, Student A called Dean Hart.  *Id.*, ¶20.  Dean Hart said that he was unaware that Doe had been hired as a Green Dean and would look into the matter.  *Id.*[9]  Later that day, Dean Hart emailed Student A suggesting that he speak with Laurie Frankl, Amherst's Title IX Coordinator. [10]  *Id.*, ¶21.

On May 13th, Ms. Frankl spoke with Student A for approximately ninety minutes. During their call, Student A stated that he had been raped by Doe at the end of the fall semester of 2009, and he provided a very detailed account of that alleged rape, as well as the negative and lasting impact that it had upon him, including a withdrawal from Amherst weeks after the alleged

---

[8]      A "Green Dean" is a position in which a recent graduate functions as an admissions ambassador for the College.  Declaration of Laurie Frankl ("Frankl Decl."), ¶3.

[9]      A few days later, Student A also spoke with Katie Fretwell, Amherst's Dean of Admission, to discuss his concerns about Doe's hiring.  Ms. Fretwell said that she had not been aware of Student A's allegations concerning Doe's sexual assault of him.  *Id.*

[10]      As Amherst's Title IX Coordinator, Ms. Frankl is responsible for campus-wide compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 ("Title IX"), its implementing regulations, and the guidance issued by the U.S. Department of Education and its Office for Civil Rights ("OCR"), as well as the policies and procedures instituted by Amherst designed to foster a climate free from sexual misconduct and sexual violence.  Her role includes providing coordinated education and prevention programs, overseeing Title IX complaints relating to sexual misconduct, and conducting and overseeing investigations in a manner that is prompt, equitable and accessible, in accordance with Amherst's policies, the requirements of Title IX, and OCR guidance.  Ms. Frankl also works to ensure compliance with Amherst's Sexual Misconduct Policy and its procedures for addressing sexual misconduct complaints against students through the student conduct process ("Complaint Procedures").  Frankl Decl., ¶2.

rape and, ultimately, his decision to leave Amherst in 2011.  Frankl Decl., ¶5.[11]  Student A said

that he had not wanted to contact Amherst about the rape, but that he had a number of concerns

that compelled him to do so, including ensuring the safety of students on campus.  *Id.*  Student A

said that he did not know if there had been any investigation of his allegations regarding Doe's

sexual assault, or any disciplinary process against Doe.  *Id.*, ¶6.

Ms. Frankl was aware that OCR's regulations require colleges to provide a "prompt and

equitable resolution" of sexual assault complaints.  *Id.*, ¶7; 34 C.F.R. §106.8(b).[12]  Ms. Frankl

also knew that OCR has recently required institutions of higher education to review and

"carefully scrutinize" complaints and reports of sexual misconduct filed by students in earlier

years to ensure, among other things, that the prior complaints were "promptly and adequately"

investigated.  *Id.*[13]  In light of the information provided by Student A, and to fulfill her

responsibilities as Amherst's Title IX Coordinator, Ms. Frankl immediately undertook a review

of the circumstances surrounding Student A's alleged sexual assault by Doe.  *Id.*

Through her review, Ms. Frankl concluded that Amherst had not conducted a proper and

thorough investigation of Student A's report of sexual assault in 2009, as required by Title IX,

OCR regulations and guidance, and Amherst's 2009/2010 Student Handbook ("2009/2010

Handbook").  *Id.*, ¶7.[14]  She also determined that no formal complaint relating to Student A's

allegations had been filed against Doe under the disciplinary procedures in the 2009/2010

---

[11]    Ms. Frankl has read Student A's declaration in this matter, and it comports with what he reported to her in their discussions.  Frankl Decl., ¶5.

[12]    To fulfill this obligation, OCR has stated that when a college knows (or reasonably should know) about an alleged sexual assault, the college "must take immediate and appropriate steps to investigate or otherwise determine what occurred."  OCR, "Questions and Answers on Title IX and Sexual Violence," at A-5 (April 29, 2014).  Frankl Decl., ¶7.

[13]    *See* Tufts University Voluntary Resolution Agreement with OCR at 15 (April 17, 2014); SUNY Voluntary Resolution Agreement with OCR at 9 (September 30, 2013).

[14]    *See* Verified Complaint, Ex. A, 2009/2010 Student Handbook at 10 ("Any behavior alleged to violate the principles of the Honor Code [which include sexual assault] …will be thoroughly investigated in a manner that protects the rights of all parties to the issue") and 24 ("Because Sexual harassment is a direct violation of the College's Statement of Respect for Persons, Amherst College will seriously and thoroughly investigate any complaints of sexual harassment and will discipline those found guilty") (emphasis added).

Handbook, that Student A's allegations had not been the subject of any disciplinary proceeding, and that Doe had not been subject to any discipline relating to Student A's allegations. *Id.*[15]

On May 15th, Ms. Frankl contacted Student A and apprised him about the lack of a proper investigation regarding his allegation of sexual assault. *Id.*, ¶9. Ms. Frankl explained that there was no time limit for bringing forward a complaint for sexual misconduct, and that, because Doe was still a student at Amherst, he was still within the College's jurisdiction if Student A wished to pursue a complaint. *Id.*[16] Ms. Frankl then discussed the options for filing a complaint against Doe. *Id.* She explained that Student A could file a complaint against Doe directly, or that, in exceptional circumstances – which Ms. Frankl believed were present – the College could initiate the Complaint against Doe. *Id.*[17] Student A stated that, because of privacy concerns and his personal circumstances, he did not want to bring forward the complaint in his own name, but instead wanted Amherst to bring forward the complaint against Doe. Student A said that he would participate fully with any investigation and hearing before Amherst's Sexual Misconduct Hearing Board ("Hearing Board"). *Id.*

On May 16th, Amherst issued a complaint against Doe arising out of the alleged sexual assault against Student A (the "Misconduct Complaint"). *Id.*, ¶10. Amherst also immediately

---

[15]     Ms. Frankl also learned that there are no notations on Doe's transcript indicating that he had been subject to discipline regarding Student A's allegations. Frankl Decl., ¶8. During the 2009/2010 academic year, Amherst's Student Handbook provided that anyone who had been adjudicated to have committed violence against another "will normally be dismissed from the college for a period of no shorter than one semester and will have recorded on his or her transcript the fact and the length of the dismissal." *Id.*; *See* Verified Complaint, Ex. A, 2009/2010 Handbook at 22 (emphasis added). There is no notation on Doe's transcript indicating that he had been subject to suspension or dismissal. Frankl Decl., ¶8. Rather, his transcript is marked with a "W," which indicates a withdrawal. *Id.* Ms. Frankl also reviewed Amherst's annual report regarding discipline issued for the 2009/2010 academic year, and there is nothing in that report stating that Doe had been subject to discipline. *Id.*; Verified Complaint, Ex. A, 2009/2010 Handbook at 22-23.

[16]     *See* Verified Complaint, Ex. H, 2013/2014 Student Handbook ("2013/2014 Handbook"), p. 42, §II (A).

[17]     *See* Verified Complaint, Ex. H, 2013/2014 Handbook, p. 43, §§ (III)(1) and (III)(2).

retained an experienced, independent investigator to conduct a prompt, thorough, fair and impartial investigation of Student A's allegations.  *Id.*[18]

***Amherst Informs Doe of the Misconduct Complaint, the Hearing Process, and His Rights***

On May 18th, Ms. Frankl met with Doe to address the Misconduct Complaint and informed him that Student A was alleging that he had been sexually assaulted by Doe (non-consensual penetration) when they were suitemates in 2009.  *Id.*, ¶11.  Ms. Frankl said that Amherst had initiated a complaint arising out of the alleged assault, and that Amherst was obligated to investigate all reports of sexual misconduct.  She provided Doe a copy of the Misconduct Complaint and reviewed it with him, in accordance with Amherst's Complaint Procedures.  *Id.*[19]  Ms. Frankl explained that the College had retained a trained investigator to conduct a thorough and neutral investigation of the allegations, and she stated that the investigator would meet with witnesses and review evidence.  *Id.*  To ensure that Doe understood his rights and responsibilities under Amherst's Complaint Procedures, Ms. Frankl explained that Doe had the right to an advisor (and provided him a list of individuals who had received training in Amherst's Hearing Board process), explained the Hearing Board process, stated that he had the opportunity to submit a written response to the College's complaint, and provided Doe a copy of the 2013/2014 Handbook, which includes the Complaint Procedures.  *Id.*

On June 11th, Amherst received a copy of the investigator's report.  *Id.*, ¶14.  The report is detailed and reflects that the investigator interviewed twelve witnesses (including Student A, Doe, and others among Amherst's students, faculty, and staff) and gathered and reviewed numerous documents (including the written statements of Student A and Doe, Student A's transcript, correspondence between Amherst and Doe, and emails of administrators, faculty,

---

[18]     As required by Amherst's policies, the investigator has extensive training and experience investigating allegations of sexual misconduct.  *Id.  See* Verified Complaint, Ex. H, 2013/2014 Handbook p. 44, §(IX)(1).
[19]     *See* Verified Complaint, Ex. H, 2013/2014 Handbook, p. 44, §(VIII)(2).

Student A and Doe). The investigator's report reviews and summarizes the versions of events provided by Doe and Student A, noting where those versions converge and diverge. *Id.*[20] A copy of the investigator's report was provided to Doe on June 11th, in accordance with Amherst's Complaint Procedures. *Id.*

### The Hearing Board Process

The Hearing Board that is slated to hear the Misconduct Complaint against Doe is comprised of three persons drawn from a pool of individuals from the other four colleges that make up the five college consortium of which Amherst is a member (the other members are Mount Holyoke College, Smith College, University of Massachusetts Amherst, and Hampshire College). *Id.*, ¶15. As required by the College's Complaint Procedures, all board members have prior experience in, and have received prior training regarding, the dynamics of sexual misconduct, the factors relevant to a determination of credibility, the appropriate manner in which to receive and evaluate sensitive information, the manner of deliberation and the application of the preponderance of the evidence standard, as well as the College's policies and procedures. *Id.*[21] At the hearing, Doe will have the opportunity, among other things, to provide an opening statement, question the investigator, respond to questions from the Hearing Board, call witnesses, question witnesses (including Student A, through the Chair of the Hearing Board),

---

[20]   In the Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order And/Or Preliminary Injunction ("Memo"), Doe appears to complain that the investigator has offered "impressions" about Student A's testimony. Memo at 13-14. In fact, the investigator offered her impressions about the testimony of *both* Student A and Doe. For example, the investigator observed that Student A's statements "were detailed and consistent and did not appear to be embellished or exaggerated," and that he had been "forthcoming," even about information that "might tend to show him in a poor light" or "facts that [Doe] could argue amounted to consent…." Frankl Decl., ¶14. With respect to Doe, the investigator observed that his statements "appeared candid as he admitted many of the facts alleged by others – facts which do not present him a positive light." *Id.* The investigator's impressions are permissible under Amherst's Complaint Procedures. *See* Verified Complaint, Ex. H, 2013/2014 Handbook, p. 45, §(IX)(3) ("The Investigator may provide a summary of his/her impressions …") (emphasis added). Under Massachusetts law, the Hearing Board is free to consider these impressions to the extent it deems appropriate. *See Schaer v. Brandeis University*, 432 Mass. 474, 481 (2000) ("It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject.")

[21]   *See* Verified Complaint, Ex. H, 2013/2014 Handbook, p. 46, §(X)(2)(A).

and provide a summary statement of his position. *Id.*, ¶17. If he is found responsible, Doe will

also have rights of appeal, as set forth in the Complaint Procedures. *Id.*[22]

## ARGUMENT

I.  **DOE HAS FAILED TO MEET HIS BURDEN OF ESTABLISHING THAT THIS COURT MAY GRANT THE EXTRAORDINARY RELIEF OF ISSUING A PRELIMINARY INJUNCTION TO BAR AMHERST'S DISCIPLINARY PROCESS.**

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553

U.S. 674, 676 (2008) (internal quotations omitted).[23] "A plaintiff seeking a preliminary

injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to

suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in

his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def.

Council, Inc.*, 555 U.S. 7, 20 (2008) (numerals added).

A court should be especially cautious when a party is seeking an injunction intended to

thwart disciplinary proceedings at a private college. "Courts are chary about interfering with

academic and disciplinary decisions made by private colleges and universities." *Schaer*, 432

Mass. at 482. *See Guckenberger v. Boston University,* 974 F. Supp. 106, 150-151 (D. Mass.

1997) ("'[C]ourts should be slow to intrude into the sensitive area of the student-college

relationship, especially in areas of curriculum and discipline'") (internal citations omitted).

"Great deference is extended to university decision-making on academic and disciplinary

matters." *Morris vs. Brandeis University*, 60 Mass. App. Ct. 1119, *1 (2004) (unpublished

disposition) (citing *Schaer,* 432 Mass. at 482; *Berkowitz v. President & Fellows of Harvard

College,* 58 Mass. App. Ct. 262, 269 (2003)). Here, Doe's request for an injunction barring

---

[22]     *See* Verified Complaint, Ex. H, 2013/2014 Handbook, p. 50, §(X)(2)(F)(1-2).
[23]     Doe's request for a temporary restraining order is moot because Amherst does not intend to hold the disciplinary hearing before the Hearing Board until Doe's motion for a preliminary injunction is decided.

Amherst from proceeding with a hearing on the Misconduct Complaint disregards these

principles, and he has failed in every particular to establish an entitlement to injunctive relief.

## II.   DOE HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON HIS BREACH OF CONTRACT CLAIM.

Doe argues that Amherst's decision to initiate the Misconduct Complaint and commence

a hearing before the Hearing Board "contravened expectations [Doe] reasonably formed" based

on the 2009/2010 Handbook and the Behavioral Contract, which he contends supports his claim

for Breach of Contract (Count I).  Memo at 1-2. [24]  As shown below, none of Doe's allegations

regarding Amherst's conduct suggest that the College failed to meet any reasonable expectation

created by the 2009/2010 Handbook.  Additionally, Doe has failed to identify any obligation

created by the Behavioral Contract with which Amherst has failed to abide.

### A.   Doe has Failed to Establish that the 2009/2010 Handbook Obligates Amherst to Refrain from Conducting a Disciplinary Hearing.

The Supreme Judicial Court established the standards for interpreting a contract claim

based on a private university's student handbook in *Schaer vs. Brandeis University,* 432 Mass. at

478-481.  In such actions, the Court employs the standard of "reasonable expectations" by

determining what meaning the school should have reasonably expected the student to give to the

provisions of the handbook.  *Id.*  The school's reading must simply "fall within the range of

reasonable expectations of one reading the relevant rules."  *Cloud v. Trustees of Boston Univ.*,

720 F.2d 721, 724 (1st Cir. 1983).  Here, Doe's contract claim will fail because he does not, and

cannot, identify any reasonable expectation created by Amherst's 2009/2010 Handbook that the

college failed to meet.

---

[24]     Doe's Motion for a Temporary Restraining Order and/or Preliminary Injunction is premised in its entirety on Doe's claim for Breach of Contract (Count I).  Memo at 15 n. 11.

1.      Doe Was Granted a Voluntary Medical Leave in 2010 and Was Not
Previously Subject to Discipline Under the 2009/2010 Handbook.

Doe argues that he was "forced" to take a one-year medical leave in early 2010, which he

now characterizes as a "sentence that he has already served" with respect to Student A's

allegations of sexual assault.  Memo at 2.  Based on this characterization, Doe contends, in

essence, that he has already been disciplined under Amherst's 2009/2010 Handbook, and that

Amherst is contractually barred from pursuing a disciplinary proceeding that may result in a

"second punishment for the same offense."  Memo at 29.   Doe's argument fails for two reasons.

First, Doe's voluntary withdrawal was not a disciplinary penalty under Amherst's

2009/2010 Handbook.  Doe was never subject to any disciplinary penalty under Amherst's Code

for the simple reason that no disciplinary process was ever commenced.  Under the 2009/2010

Handbook, Amherst's "disciplinary system" could only go forward after the filing of "a [formal]

complaint within the college's disciplinary system."  Verified Complaint, Ex. A, 2009/2010

Handbook at 14.  Once the disciplinary system had been initiated in this manner, the "accused

student" had the right to obtain a written copy of the complaint, and potentially meritorious

complaints would be referred for adjudication to the "Committee on Discipline."  *Id.* at 15.  After

adjudication, the Committee on Discipline was then "empowered to impose penalties" upon the

accused student for violations of the College's Honor Code.  *Id.* at 20.[25]  With respect to Student

A's allegations of sexual assault against Doe, none of this ever happened.

Here, as Doe admits, Student A "did not initiate a complaint" against Doe, Doe "was

never formally charged with a violation" of the Honor Code, and there was "no formal process"

against him.  Memo at 18, 19, 21.  Beyond dispute, the Committee on Discipline never

---

[25]      Doe agrees with this description of the hearing and disciplinary process provided under the 2009/2010
Code.  *See* Memo at 21 ("[T]he fact is 'discipline' as 'defined in [the] code' is only required when a hearing board
finds a student responsible for violating the Honor Code following the filing of a formal complaint.")

adjudicated any case against him and never issued any disciplinary sanction. As a consequence, Doe has no reasonable expectation that Amherst is precluded from pursuing a disciplinary process now. *See Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 710 (D. Vt. 2012) *aff'd*, No. 13-cv-2614, 2014 WL 2808091 (2d Cir. June 23, 2014) (declining to characterize student's dismissal from hockey team as discipline where college's "[h]andbook clearly and unambiguously states that the [disciplinary] [b]oard's jurisdiction attaches when a student has been 'charged'," the student was never charged, and thus the "[b]oard's jurisdiction was never triggered").

Second, Doe's withdrawal was granted by Amherst to allow him to address various personal issues, and was not a dismissal based on any determination that he had sexually assaulted Student A.[26] The document memorializing Doe's medical leave reflects that the withdrawal was not a "disciplinary sanction" that Amherst "forced" upon him, but instead was a leave that Amherst "granted" to Doe in accordance with Amherst's voluntary withdrawal policies to allow Doe the opportunity to address his personal and medical issues. *See supra*, p. 6 n. 7; Verified Complaint, Ex. C. Dean Hart's March 31, 2010 letter to Doe is clear on this point, stating:

> [Y]our actions violated the standards of the Honor Code and <u>could have resulted in disciplinary action being taken against you</u>, including a likely disciplinary suspension. <u>However</u>, I took in consideration the fact that your alcohol use and resulting behavior reflected some deeper personal issues with which you have been struggling for some time. <u>In light of those underlying issues, I decided to place you on a medical withdrawal, rather than impose a disciplinary suspension, to allow you the opportunity to address those issues in a therapeutic, rather than a punitive manner.</u> *Id.* (emphasis added).[27]

---

[26] As noted above, Doe's transcript reflects that he received a withdrawal, not that he was the subject of a disciplinary dismissal. *See supra*, p. 9 n.15.

[27] Dean Hart also emphasized that Doe's withdrawal was "without grade penalty," and that "a notation of 'W' [for withdrawal] will appear on your transcript for each of your spring semester courses and will not figure into the computation of your grade point average." *Id.*

In contemporaneous communications at the time of his leave, Doe similarly described his

leave as a "provisional withdrawal" that was an effort by Amherst "to help [him] out."  Verified

Complaint, Ex. E.  Doe assured Amherst that the "hiatus" he had "received" was having a

salutary effect, stating, "I feel I have made progress in that I am now fully aware of who I am

and what I want in terms of relationships and have resolved to abandon all potentially hazardous

activities and behaviors."  *Id.*  Doe validated the voluntary nature of his leave in a posting on his

personal blog just several weeks after his departure from Amherst, stating:

> I am now back at home, sunny South Africa getting geared up for the FIFA World Cup,
> after a short-lived spiel at Amherst College in Massachusetts, USA.  I am supposed to be
> on Medical Leave (I requested it because I was going through some mad hard personal
> stuff—which is subject matter for another complete blog), but I am working myself like a
> bee!  Roberts Decl., Ex. 9 (emphasis added).

The voluntariness of Doe's leave was further confirmed when Amherst submitted a letter

on December 7, 2010 to the U.S. Customs and Border Patrol and U.S. Department of Homeland

Security in support of his application for an F-1 student visa to enable his return to the College.

That letter stated:

> Before the conclusion of the Spring 2010 semester, Mr. [Doe] requested and was granted
> a voluntary leave of absence, so that he could return home to South Africa.  Mr. [Doe]
> left Amherst College in good academic standing and financial status.  Roberts Decl., Ex.
> 10 (emphasis added).

Given this, Doe's current contention that Amherst "imposed" a "forced medical leave" upon

him, and that the leave was a "sanction… tantamount to dismissal" is unfounded.   Memo at 19.

> 2.    Student A's Allegations of Sexual Assault and Rape Were Not
>        "Informally Resolved" Pursuant to the Procedures in the 2009/2010
>        Handbook.

Perhaps recognizing that his claim of prior discipline for the alleged sexual assault is not

credible, Doe next argues that he believed that he had "resolved" what he calls his

"disagreement" with Student A through "informal consultation" and a "process akin to

16

mediation," and that Amherst's 2009/2010 Handbook "articulated [a] preference for avoiding the formal disciplinary process," even in the case of forcible and physical sexual assault. Memo at 1, 16, 19. Doe has no reasonable basis for any such belief because the 2009/2010 Handbook expressly defined what constituted "mediation," and no such mediation – or anything "akin" to that process – ever occurred.

The 2009/2010 Handbook provided that students who wished "to resolve grievances through mediated dispute resolution" were required to obtain the approval of the Dean of Student Conduct before any "mediated negotiation may be attempted," and the "agreed-upon terms of a mediated resolution must be signed by the complainant, the responding student and the mediator." Verified Complaint, Ex. A, p. 15. Here, Doe does not and cannot offer any evidence that Student A ever expressed any desire to "mediate" his allegations of rape, or pursue any form of "amicable" resolution regarding them.[28] To the contrary, Student A's affidavit makes clear that Doe's continued presence on campus triggered substantial emotional and physical deterioration – causing him to fear for his safety, and ultimately forcing him to withdraw from the college – and that he never sought to mediate his allegations against Doe. Student A states:

> I … didn't engage in any kind of mediation with Doe under Amherst's procedures. Because of the strain I felt whenever I was near him, I did my best to avoid any encounter with Doe. Student A Decl., ¶13 (emphasis added).

Given Amherst's policies and Student A's conduct, Doe could not have had any reasonable expectation that Student A's allegations of sexual assault were informally resolved.[29]

Even if Student A had asked to mediate his allegations of sexual assault (which he did not), there is no evidence that any such request would or could have been approved by the Dean

---

[28]    The 2009/2010 Handbook stated that the College's "disciplinary system exists for those situations and acts which will not, or cannot, be resolved through amicable discussion." Verified Complaint, Ex. A, p. 12. Student A expressed no desire to have an "amicable discussion" with Doe about his alleged rape.

[29]    There is nothing in Amherst's policies, then or now, that would have permitted the College's "administrators" to negotiate the resolution of Doe's allegations of sexual assault, as Doe suggests. Memo at 1.

of Student Conduct.  While Amherst's 2009/2010 Handbook permitted a student "who believed

he or she has been *harassed*" to consult with a member of the Amherst community "to *consider*

*what constitutes sexual harassment* and to review the individual's experience," no such similar

invitation was made with respect to rape or sexual assault.  Verified Complaint, Ex. A at 25

("Seeking Redress in Cases of Sexual Harassment") (emphasis added).  Read reasonably and

contextually – and not in the fragmented fashion argued by Doe, *see* Memo at 16-17[30] – the

2009/2010 Handbook recognized that it was "possible" for some types of sexual harassment to

occur "unintentionally," and that "informal consultation" might help foster understanding

regarding the "experience."  Verified Complaint, Ex. A at 23, 25.  In stark contrast, "victims of

rape or sexual assaults" were counseled in a very different manner in a separate and distinct

provision in the 2009/2010 Handbook entitled "**Sexual Assault**."  Verified Complaint, Ex. A at

25 (bold in original).[31]  In that provision, Amherst emphasized the gravity of rape and sexual

assault and expressly "encouraged [victims] to report immediately any incidents of [rape or

sexual assault] to the Campus Emergency line," and "urged [them] to keep in mind that an

assailant who is allowed to go unpursued is a potential danger, not only to the initial victim but

also to other members of the community."  *Id.* (emphasis added).  Nothing in this provision

---

[30]     Under Massachusetts law, "a contract must be read as a whole."  *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 160 (1st Cir.2005).  The meaning of a contract "cannot be delineated by isolating words and interpreting them as though they stood alone."  *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 785 (1st Cir. 2011) (internal quotations omitted).  "Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded."  *Id.* (quoting *Starr v. Fordham*, 420 Mass. 178, 190 (1995)).

[31]     By its terms, the provision in the 2009/2010 Handbook entitled "**Sexual Assault**" listed sexual harassment, sexual assault, and rape as distinct offenses, and did not conflate them, as Doe seeks to do.  *See* Verified Complaint, Ex. A at 26 ("The college may impose the full range of disciplinary sanctions, up to and including expulsion, on students who are found guilty of having committed infractions involving *sexual harassment, sexual assault, rape* or other sex offenses.") (emphasis added).

could have created any reasonable expectation on Doe's part that allegations of rape and sexual assault would or could be approved for informal or amicable resolution.[32]

In sum, nothing in Amherst's 2009/2010 Handbook reasonably suggests that Student A's allegations of sexual assault could have been the subject of an informal resolution, and they were not in any event.[33]  *See Sullivan v. Boston Architectural Ctr., Inc.*, 57 Mass. App. Ct. 771, 775 (2003) (student had no "reasonable expectation" that architectural school "would not follow its own procedures developed to resolve [grade] disputes [with faculty members] but would instead agree to adopt a different approach that the student preferred;" court refused to "second-guess or supplement" the procedures of the school).

> 3.      Doe Has No Reasonable Expectation that the College's Misconduct Complaint Is Untimely.

Doe argues that Amherst has no "valid" motive for initiating the Misconduct Complaint at this time (Memo at 18-19), and he suggests (but does not expressly argue) that the complaint is untimely under the terms of the 2009/2010 Handbook.  He is wrong on both points.

The 2009/2010 Handbook provided that, while complaints under Amherst's Code of Conduct "should" generally be brought within ninety (90) days after the alleged violation,

---

[32]      Since at least 1997, the OCR has maintained that, "[i]n some cases, such as alleged sexual assaults, mediation will not be appropriate, even on a voluntary basis."  OCR, "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," 62 FR 12034, 12045 (March 13, 1997) (Rev. January19, 2001).  On April 4, 2011, the OCR issued a "significant guidance document" confirming that a college's "[g]rievance procedures generally may include voluntary informal mechanics (*e.g.*, mediation) for resolving some types of sexual harassment complaints," but that "in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis."  Russlyn Ali, Assistant Secretary of Civil Rights, "Dear Colleague Letter," at 8 (April 4, 2011) (available at http://www2.ed.gov/about/offices/list/ocr/letters/ colleague-201104.pdf).  While the current 2013/2014 Handbook provides for a "voluntary resolution" process for some complaints, the Code continues to state that the Dean of Students must determine that the process is "suitable" for a particular matter, and states that the process may not be used with respect to any complaint of "sexual violence," which includes sexual assault and rape.  Verified Complaint, Ex. H at 42 (stating that "sexual violence" includes "rape" and "sexual assault") and 45 (excluding complaints of sexual violence from the voluntary resolution process).
[33]      Doe argues that it "appear[s]" that Amherst is attempting to "appeal" an "informal" resolution of Student A's allegations of sexual assault against Doe, and that the 2009/2010 Handbook does not permit such appeals. Memo at 20.  For reasons discussed above, this straw man argument is premised on a fallacy, namely the existence of an "informal" resolution.  The argument thus fails.

complaints could be filed "<u>well beyond</u> the normative 90-day framework" in cases involving

"<u>absence[s] from campus</u>" or "<u>possible consequences of sexual assault</u> or harassment."  Verified

Complaint, Ex. A at 14 (emphasis added).[34]  In his papers, Doe concedes that if Student A

harbored "fear of reprisal or other concerns" relating to the reported sexual assault, that would

provide a "valid" motive for extending the usual framework for filing a complaint.  Memo at 19.

That is precisely what occurred in this case.

Following the alleged rape, Student A reports that he underwent substantial emotional

and physical deterioration, which resulted in his hospitalization and withdrawal from Amherst,

less than sixty (60) days after the alleged assault occurred.  Student A Decl., ¶¶9-12.  While

Student A was able to return for the fall semester of 2010, he reports that he again fell apart,

emotionally and academically, after Doe's return in January 2011.  *Id.*, ¶¶15-17.  Doe's presence

made Student A feel unsafe and intimidated, and Student A avoided encounters with him.  *Id.*,

¶¶9, 13, 16, 17.  Because of these continued concerns about his health and safety, Student A

decided to leave Amherst permanently at the end of the 2010/2011 academic year.  *Id.*, ¶18.

Given the circumstances described by Student A, it is understandable that he did not

move forward with a complaint against Doe while Student A was still a student at Amherst, and

that it is only now that he reports having the emotional strength to pursue a complaint against

Doe.  *Id.*, ¶24.  *See* OCR, "Questions and Answers on Title IX and Sexual Violence," at E-2

(April 29, 2014) (available at http://www2.ed.gov/about/offices/list/ocr/docs/ qa-201404-title-

ix.pdf ) ("Schools should be mindful that traumatic events such as sexual violence can result in

---

[34]     The statement that conduct complaints "should" be brought within ninety (90) days did not create a *requirement* that complaints had to be filed within that time frame.  *See Knelman*, 898 F. Supp. 2d at 709 ("[C]ourts will only enforce terms [in a student handbook] that are 'specific and concrete' . . . .[and not] [l]anguage in a college handbook or other official statement that is merely aspirational in nature"); *Cybertech Grp., Inc. v. United States*, 48 Fed. Cl. 638, 649 (Fed. Cl. 2001) ("[I]n everyday discourse, 'shall' is used to denote an affirmative command or obligation whereas 'should,' by contrast, is used to denote a request or suggestion.")

delayed decision-making by a student who has experienced sexual violence."); *Commonwealth v. King*, 445 Mass. 217, 237-38 (2005) ("[R]esearch . . . on the behavior of victims of sexual assault in the aftermath of the crime . . . suggests that, in part because the harm suffered by sexual assault victims often consists of the psychological harm caused by the defendants' violation of a victim's body, such victims respond in a variety of ways to the trauma of the crime, and often do not promptly report or disclose the crime for a range of reasons, including shame, fear, or concern they will not be believed."). The consequences of the alleged assault of Student A, as well his separation from Amherst, provide strong and valid justification for Amherst's decision to bring forward the Misconduct Complaint at this time.

Doe's assertion that Student A "still has not filed a complaint" (Memo at 18) is misleading to the extent that it suggests that Student A does not wish to pursue the complaint. To the contrary, Student A has directly informed Amherst that he wants the College "to pursue a formal complaint against Doe," but that because of difficult personal circumstances and a desire for privacy, he does not want to be the named complainant. Student A Decl., ¶24; Frankl Decl., ¶9. Amherst has appropriately and permissibly brought forward the Misconduct Complaint against Doe at this time, and in its name.[35]

Accordingly, Doe has failed to show that he has any likelihood of establishing that Amherst contravened any reasonable expectation created by the 2009/2010 Handbook by filing the Misconduct Complaint or pursuing a disciplinary hearing before the Hearing Board.

---

[35]     Under Amherst's Complaint Procedures, Amherst may initiate a complaint through the Dean of Student Conduct against a student of the College in exceptional circumstances, which is what Amherst has done here. Verified Complaint, Ex. H at 45; Frankl Decl., ¶9. It bears emphasizing that Doe does not argue that Amherst's decision to initiate the Misconduct Complaint in its name contravened any reasonable expectation that he had under any version of Amherst's Student Handbook.

**B.      Amherst has Not Breached Any Obligation Created by Doe's "Behavioral Contract" By Pursuing a Hearing on the Misconduct Complaint.**

Doe confusingly argues that the Behavioral Contract that he entered upon his return to Amherst in January 2011 created a "reasonable expectation" that, if he behaved in an appropriate manner during his time at Amherst, "he would not and could not be subjected to 'further disciplinary action.'"  Memo at 21-22.  This argument is analytically unsound and misguided.

As Doe recognizes in his memorandum, the standard of "reasonable expectation" applies to an institution's manifestations *in a student handbook*.  Memo at 16.  The Behavioral Contract, however, is *not* part of Amherst's student handbook; it is a stand-alone document.  Accordingly, the Behavioral Contract must be analyzed according to its terms, in accordance with basic principles of contract law.  *Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992) (An "unambiguous [contract] is to be enforced according to its terms."); *ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094, 1097 (D. Mass. 1990) ("[A] contract should be construed in accordance with its plain meaning . . . [and] Massachusetts law enforces the express terms of a contract" absent ambiguity).

Although Doe declares that Amherst has "contractual obligations" that are "obvious" (Memo at 24), he conspicuously fails to identify *any* "obligation" created by the Behavioral Contract that Amherst purportedly breached.  *See Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC*, No. 09-cv-11873, 2014 WL 1278012, *3 (D. Mass. Mar. 26, 2014) (breach of contract claim requires proof of "breach of a specific provision of the contract").  This perhaps explains why Doe's claim for Breach of Contract in Count I of his Verified Complaint is based solely – and, for reasons explained above, unjustifiably – on Amherst's 2009/2010 *Handbook*.  Indeed, Count I is tellingly titled "COUNT I – BREACH OF CONTRACT – *Student Handbook*." (Original italics; underscoring added).  Nowhere in Count I, nor anywhere else in his Verified

Complaint, does Doe make any mention of any obligation on the part of Amherst emanating

from the Behavioral Contract.  That is because the document only established "behavioral

conditions" that Doe was required to meet; it did not impose any obligation upon Amherst.

     In short, there is nothing in the Behavioral Contract that purports to insulate Doe from

future disciplinary proceedings based on his alleged sexual assault of Student A.  To the

contrary, the Behavioral Contract explicitly states that "<u>ANY VIOLATION</u> OF THE AMHERST

HONOR CODE may result in further disciplinary actions against you, up to, and including,

dismissal from Amherst College."  Verified Complaint, Ex. F (original capitalization;

underscoring added).  The words "ANY VIOLATION OF THE AMHERST HONOR CODE"

mean exactly what they say, and they plainly encompass "ANY VIOLATION" of the Code –

past, present and future.

     In support of his argument that purported "reciprocal promises" emanating from the

Behavioral Contract bar Amherst from pursuing a sexual misconduct complaint against him, Doe

relies heavily on *Babcock v. New Orleans Baptist Theological Seminary*, 554 So. 2d 90 (La. Ct.

App. 1989).  Memo at 22-24.  Doe's reliance on *Babcock* is misplaced, as that case is readily

distinguishable from this matter.  In *Babcock*, a seminary dismissed a student based on

accusations that he was considering a divorce.  *Babcock*, 554 So. 2d at 91-92.  The student then

obtained a temporary restraining order requiring the seminary to reinstate him, based on the

contention that the seminary had failed to grant him a hearing as required by the procedures in

the seminary's handbook.  *Id.* at 92-93.  Rather than defend against those allegations, the

seminary agreed to a "consent judgment" providing for "the entry of a permanent injunction . . .

prohibit[ing] the Seminary from dismissing him based upon his conduct or activities <u>on or before</u>

<u>[the date of the judgment's entry]</u>," including, therefore, his marital issues.  *Id.* at 93 (emphasis

added).  Notwithstanding the entry of this injunction, when the student completed his coursework two years later, the seminary's faculty found him spiritually unfit and refused to award his ministerial degree.  *Id.*  The student again sought injunctive relief, and the trial court issued a preliminary injunction directing the seminary to graduate and confer a degree upon the student, which the seminary appealed.  *Id.* at 96.  On appeal, the appellate court found that the seminary had refused to award his degree based on "conduct that occurred prior to [the date of the consent decree]," in direct violation of the seminary's consent agreement.[36]

Here, by contrast, Amherst *never* agreed to refrain from pursuing a complaint against Doe based on conduct that occurred before the date of the Behavioral Contract, including the alleged sexual assault.  To the contrary, Amherst expressly reserved its right to pursue disciplinary action against Doe for "ANY VIOLATION" of the Honor Code, without temporal restriction.  While Doe may have *hoped* that Amherst would not pursue disciplinary actions for events that occurred before the date the Behavioral Contract was entered, Amherst made no such agreement in the Behavioral Contract, or anywhere else.  *See Held v. Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982) (A court "cannot supply [] provisions without writing a contract for the parties which they themselves did not make.").  *See generally Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir.1987) ("Secret hopes and wishes count for nothing.  The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves.").

Accordingly, Doe has failed to show that he has any likelihood of establishing that Amherst violated the Behavioral Contract by filing the Misconduct Complaint or pursuing a disciplinary hearing before the Hearing Board.

---

[36]     The court found "no significant difference" between dismissing the student and refusing to award a degree, stating, "If the Seminary cannot dismiss Babcock for <u>conduct prior to August 19, 1987</u> [the date of the consent decree], it cannot withhold a degree because of that conduct."  *Id.*  at 97 (emphasis added).

III.    DOE HAS FAILED TO ESTABLISH A SUBSTANTIAL THREAT OF
        IRREPARABLE HARM.

"[P]erhaps the single most important prerequisite for the issuance of a preliminary

injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable

harm before a decision on the merits can be rendered." *Voice of the Arab World, Inc. v. MDTV*

*Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting 11A Charles Alan Wright,

Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948, at 139 (2d

ed.1995)).   "[A]n injunction should issue only where the intervention of a court of equity is

essential in order effectually to protect property rights against injuries otherwise irremediable."

*Id.* (quoting *Weinberger v. Romero–Barceló*, 456 U.S. 305, 312 (1982)).   Irreparable harm is "a

substantial injury that is not accurately measurable or adequately compensable by money

damages."  *Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32, 40 (D. Mass. 2013) (internal

quotations omitted).   The party seeking an injunction must demonstrate that the risk of

irreparable harm is "significant."  *E.E.O.C. v. Astra USA, Inc.*, 94  F.3d 738, 742 (1st Cir. 1996).

"A finding of irreparable harm must be grounded on something more than conjecture, surmise, or

a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund*

*II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).   "Rather, the threat of irreparable

harm must be real and immediate."  Here, Doe has failed to establish that he will suffer

significant, immediate and irreparable harm if the disciplinary hearing goes forward.

A.      Doe's Assertion that the Hearing May Cause Personal Strain and
        Embarrassment Does Not Establish Irreparable Harm.

In support of his claim of irreparable harm, Doe argues that appearing before the Hearing

Board will cause him "personal strain" and "embarrassment."  Memo at 29.  Of course, that is

likely true for anyone who appears before the Board, but it does not provide the basis for a claim

of irreparable harm.  Although appearing at the private disciplinary hearing may cause Doe some anxiety, such "psychological[] trouble[]" does not typically warrant injunctive relief.  *See DeNovellis v. Shalala*, 135 F.3d 58, 64 (1st Cir. 1998) (refusing to enjoin adverse employment action based on purported emotional distress).[37]

In an effort to bolster his claim of emotional harm, Doe cites to "double jeopardy jurisprudence," claiming that he has "twice been put in jeopardy for the same offense."  Memo at 29 n. 22.  The analogy is misguided, legally and factually.  First, the double jeopardy clause of the Fifth Amendment applies only to criminal proceedings, where a defendant's life and liberty is at risk.  *See Abney v. United States*, 431 U.S. 651, 661-662 (1971) (double jeopardy concerns relate to risk of criminal conviction).  The clause does not apply to a private college's disciplinary proceedings, as Doe acknowledges.  Memo at 29 n.22.[38]  Second, no prior disciplinary proceeding was ever commenced against Doe, so there is no basis to say that he was previously "in jeopardy."  Put simply, Amherst is not attempting to hold Doe responsible after an earlier determination that he was not responsible.

**B.     Doe's Assertions that He Faces Homelessness, Unemployment, and Deportation Absent a Preliminary Injunction Are Entirely Speculative.**

Doe further argues that, unless Amherst ceases the disciplinary proceeding and awards him a degree, he will be "more or less" homeless, unable to obtain a position that he considers "suitable" and "comparable" to the Green Dean position, and facing deportation.  Memo at 30; Verified Complaint, ¶¶161, 169.  Doe overstates his case.

---

[37]     Because emotional distress is compensable by money damages, it is not generally considered irreparable. If Doe ultimately prevails on the merits of his claims in this matter (which is unlikely, for the many reasons detailed above), he may seek monetary compensation. *See DeNovellis*, 135 F.3d a 64.

[38]     Even in criminal prosecutions, where much more is at stake than here, courts have recognized that "[t]he inconvenience and cost of mounting a defense, both financially <u>and emotionally</u>, do not constitute irreparable loss sufficient to enjoin a good faith prosecution." *Doe v. Sorsai*, No. 3:12-CV-00065, 2012 WL 2954107, *8 (S.D.W. Va. June 18, 2012) (emphasis added).

To obtain an injunction, Doe must show that "irreparable injury is *likely* in the absence of an injunction" and not merely "possib[le]." *Winter*, 555 U.S. at 22. "Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction." *In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 902 (1st Cir. 1988).

Doe relies entirely on speculation in suggesting that he is at risk of homelessness. He admits that he is currently living in a friend's apartment, but, in an attempt to raise the specter of possible harm, he asserts that the friend's lease "does not permit long-term guests." Verified Complaint, ¶170. Doe does not allege that his friend's landlord has objected to his presence in the apartment, or even knows about it. Nor has Doe alleged that he has no other place to stay if it comes to pass that he is asked to leave his friend's apartment. Doe's current living arrangement stands in stark contrast to those presented in the cases upon which he relies, where courts enjoined the defendants from taking actions that would have directly and immediately rendered the plaintiffs homeless. *Suero v. Fed. Home Loan Mortgage Corp.*, No. 13-cv-13014, 2013 WL 6709001, *6-8 (D. Mass. Dec. 17, 2013) (barring defendant purchaser of plaintiffs' residence at foreclosure sale from taking steps to sell the property or evict plaintiffs); *Smith v. State Farm Fire & Cas. Co.*, 737 F. Supp. 2d 702, 705, 715 (E.D. Mich. 2010) (requiring homeowners' insurer to continue making alternative living expenses payments to plaintiffs whose home had been rendered inhabitable by fire).

Doe's theoretical difficulty in finding "suitable" or "comparable" employment for some period of time does not raise the prospect of irreparable injury. Verified Complaint, ¶¶161, 169. Even if Doe incurs any loss of pay for which he has an actionable claim, any resulting damage is entirely compensable, not irreparable. "[A] temporary loss of income which may be recovered later does not usually constitute irreparable injury." *DeNovellis*, 135 F.3d at 64.

Finally, Doe's assertion that he is on the "verge of deportation" is not correct.  Memo at 25.  As Doe admits, he has obtained an extension of his F-1 visa for Optional Practical Training ("OPT"), which permits him to remain in the United States for a year.  Verified Complaint, ¶¶117, 159-160.  Even absent his job as a Green Dean, Doe's visa will remain effective if he obtains alternative employment directly related to his major area of study, namely Law, Jurisprudence and Social Thought.  8 C.F.R. § 214.2(f)(10)(ii)(A); Verified Complaint, ¶113.  Doe has presented no evidence that he has sought, or has been unable to obtain, any such alternative employment.  Moreover, the federal regulations permit Doe to remain unemployed for ninety days while on an F-1 OPT visa.  8 C.F.R. § 214.2(f)(10)(ii)(E).  If his employment authorization expires, Doe will then have an additional, sixty-day grace period in which to obtain employment.  8 C.F.R. § 214.2(f)(10)(ii)(D).  Accordingly, Doe has several months in which to obtain alternative employment, and he is not at immediate risk of deportation.[39]  By contrast, the plaintiff in *Karakozova v. Univ. of Pittsburg*h, No. 09-cv-0458, 2009 WL 1652469 (W.D. Pa. June 11, 2009), the only case cited by Doe on this point, faced "immediate deportation" if her employment with the defendant ceased.  *Id.* at *4.  Absent continued employment, her visa was set to expire in just three days.  *Id.* at *1.

Doe has not met his burden on establishing the existence of irreparable harm, which is an "essential prerequisite" for injunctive relief in nearly all instances.  *Charlesbank Equity Fund II*, 370 F.3d at 162 (internal quotations omitted).   For that reason alone, his request for a preliminary injunction should be denied.

---

[39]    Amherst has offered to connect Doe with resources to assist him in navigating his concerns about his employment and immigration/visa status.  Regarding Doe's emotional state, Ms. Frankl and Doe also discussed a plan for his care, and she worked with Amherst's Case Manager to make certain that an ongoing plan for Doe's care was put in place.  Frankl Decl.,¶13.

## V.     EQUITY AND STRONG PUBLIC POLICY OVERWHELMINGLY SUPPORT AMHERST'S EFFORTS TO GO FORWARD WITH A HEARING ADDRESSING ALLEGATIONS OF SEXUAL MISCONDUCT ON ITS CAMPUS.

"Sexual assault is a serious social, public safety, and public health problem that affects men and women across the country."[40]  "When young women get to college, nearly 20% of them will be victims of attempted or actual sexual assault, as will about 6% of undergraduate men."[41] Sexual violence has devastating effects, with victims "more likely to suffer academically and from depression, post-traumatic stress disorder, to abuse alcohol and drugs, and to contemplate suicide."  *Id.*

Ending sexual violence on college campuses is a federal, state, and local priority. Congress has actively combated sexual violence on college campuses for decades, through legislation, including Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. § 1092(f), and the Violence Against Women Act of 1994, 42 U.S.C. § 14045b.  Most recently, by enacting the Campus Sexual Violence Elimination Act of 2013, Congress imposed additional obligations on higher education institutions, including mandating the adoption of certain disciplinary procedures for sexual misconduct investigations and hearings.  20 U.S.C. § 1092(f)(8)(B)(iii).  In urging its passage, Representative Carolyn Maloney explained that the Act "would increase the obligations of colleges to keep students safe and informed about policies on sexual violence" and emphasized that "[t]here's too much violence on campus."  159 Cong. Rec. H677-01.

Congress is not alone in its efforts to end sexual violence on campus.  President Barack Obama established the White House Task Force to Protect Students from Sexual Assault in

---

[40]     Christopher P. Krebs, "The Campus Sexual Assault Study," at xx (Nat'l Criminal Justice Reference Service, Dec. 2007) (available at https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf).

[41]     OCR, "Dear Colleague Letter: Sexual Violence Background, Summary, and Fast Facts," at 1 (April 4, 2011) (available at http://www2.ed.gov/about/offices/list/ocr/docs/dcl-factsheet-201104.pdf).

January 2014.[42]  In introducing the Task Force, President Obama condemned sexual violence as

"an affront to our basic decency and humanity," described current statistics as "totally

unacceptable," and urged all Americans "to teach young people – men and women – to be brave

enough to stand up and help put an end to these crimes."  *Id.*  The Task Force strives "to help

schools live up to their obligation to protect students from sexual violence," including assisting

schools in developing better disciplinary systems.[43]  Under President Obama, through significant

guidance documents issued in 2011 and 2014, the OCR has set forth detailed requirements for

colleges in investigating sexual assault allegations.[44]

State and local governments also recognize the strong public interest in deterring sexual

violence on college campuses.  The Governor of Massachusetts recently proclaimed April 2014

"Sexual Assault Awareness Month," noting that students who experienced sexual violence

"exhibited higher rates of many risk behaviors, [including] . . . significantly lower academic

achievement than their peers."[45]  At the local level, the Northwestern District Attorney for

Hampshire and Franklin Counties has launched a campaign to "educate college-aged students

about sexual assault and promote prevention and increased reporting of this serious problem."[46]

Beyond question, federal, state, and local policy all strongly support holding disciplinary

hearings concerning sexual misconduct allegations.  Against this widespread and vocal chorus,

Doe offers nothing more than a whisper that "the public" has an interest in the enforcement of

---

[42]      "Remarks by the President and Vice President at an Event for the Council on Women and Girls," (Jan. 22, 2014) (available at http://www.whitehouse.gov/the-press-office/2014/01/22/remarks-president-and-vice-president-event-council-women-and-girls).

[43]      "Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault," at 2-3 (Apr. 2014) (available at http://www.whitehouse.gov/sites/default/files/docs/report_0.pdf).

[44]      OCR, "Questions and Answers on Title IX and Sexual Violence," (2014); Ali, "Dear Colleague Letter: Sexual Violence," (2011).

[45]      "Proclamation of Governor Deval L. Patrick," (April 2014) (available at http://www.mass.gov/governor/constituentservices/ recognition/issuedproclamations/20140401-sexual-assault-awareness-month.html).

[46]      "Press Release: Northwestern District Attorney Seeks Media Consultant for Sexual Assault Prevention Campaign," (Aug. 1 2012) (available at https://northwesternda.org/news/nwda-seeks-media-consultant-sexual-assault-prevention-campaign).

"valid contracts."  Memo at 31-32.[47]   Leaving aside the fact that Doe's contractual claims are

not "valid," the notion that a garden-variety contract trumps overwhelming public policy is

wrong.  "If the interest in the enforcement of contractual obligations were the equivalent of the

public interest factor in deciding whether or not to grant a preliminary injunction, it would be no

more than a makeweight for the court's consideration of the moving party's probability of

eventual success on the merits."  *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358

(3d Cir. 1980).

   Any request for an injunction presents "a matter of equitable discretion," with "the

balance of equities and consideration of the public interest . . . pertinent in assessing the

propriety of any injunctive relief, preliminary or permanent."  *Winter*, 555 U.S. at 32.  Here,

Amherst wants to go forward with a hearing on allegations that one of its students was sexually

assaulted by another student.  That hearing is vitally important to Amherst, which is committed

to investigating sexual misconduct allegations fairly and thoroughly.  It is vitally important to the

integrity of Amherst's campus community, which is undercut by each sexual assault that is not

properly adjudicated and, if warranted, punished.  And, finally, Student A reports that a formal

adjudication is an important part of his recovery process.  Student A Decl., ¶29.  An injunction

barring Amherst from holding the hearing will erode its commitment to sexual respect and

undermine its authority to hold its students accountable.  *Boucher v. Sch. Bd. of Sch. Dist. of

Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) (vacating preliminary injunction postponing

expulsion of school student because "it is enough to show that school discipline, undertaken

reasonably and in good faith to protect the school's vital interest, is being undermined"); *Khan v.*

---

[47]     The case law upon which Doe relies involved the enforcement of non-competition agreements and narrowly provided that a business's interest in enforcing such agreements may outweigh temporary restrictions on the alienability of employees.  Memo at 30-31.  *See Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99, 110 (D. Mass. 2012); *Lombard Med. Technologies, Inc. v. Johannessen*, 729 F. Supp. 2d 432, 443 (D. Mass. 2010).  There is no suggestion in those cases that they have created a rule of general applicability.

*Fort Bend Independent School Dist.*, 561 F. Supp. 2d 760 (S.D. Tex. 2008) (recognizing high school's "need to enforce rules and maintain order and autonomy" in declining to issue preliminary injunction).

No one – not Amherst, not Doe, not Student A – knows what the outcome of the hearing will be.  But that truth-finding process should be permitted to go forward.  Equity and public policy demand no less.

## VI.    DOE'S REQUEST FOR CONFERRAL OF HIS DEGREE IS UNSUPPORTED, UNPRECEDENTED, AND CONTRARY TO PRINCIPLES OF EQUITABLE RELIEF.

Although Doe requests that this Court order the conferral of his degree, he offers no argument in support of this extraordinary request.  *See generally* Memo.  A preliminary injunction serves "to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."  *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).  Amherst has properly withheld Doe's degree pending the outcome of the sexual misconduct proceeding, and the status quo is that Doe does not yet have his degree.[48]  Awarding Doe his degree would impermissibly disrupt, rather than preserve, the status quo.  Conferral of a degree is not a remedy that is properly awarded at the preliminary stages of a case.  *See Phillips v. Marsh*, 687 F.2d 620, 622 (2d Cir. 1982) (vacating preliminary injunction requiring military academy to graduate cadet because no conceivable irreparable harm would accrue "in allowing her graduation to await the outcome of the trial on the merits").  Accordingly, Doe's request for conferral of his degree should be denied.

---

[48]    The 2013/2014 Handbook provides, "[w]here the Respondent is a second semester senior, the college may withhold that student's Amherst College degree pending conclusion of the student conduct proceedings."  Verified Complaint, Ex. H, 2013/2014 Student Handbook, p. 42, §II(1).

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that this Court deny

Plaintiff John Doe's motion for a temporary restraining order and/or a preliminary injunction in

its entirety.

> **AMHERST  COLLEGE, CAROLYN "BIDDY"
> MARTIN, SUZANNE  COFFEY, ALLEN
> HART, FRANCES TULEJA, LAURIE
> FRANKL and SUSIE MITTON SHANNON,**
>
> By their attorneys,
>
> /s/ Scott A. Roberts
> Scott A. Roberts (BBO No. 550732)
> sroberts@hrwlawyers.com
> Tobias W. Crawford (BBO No. 678621)
> tcrawford@hrwlawyers.com
> Hirsch Roberts Weinstein LLP
> 24 Federal Street, 12th Floor
> Boston, Massachusetts 02110
> (617) 348-4300

Dated: July 11, 2014

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing and
paper copies will be sent to those indicated as non-registered participants on July 11, 2014.

> /s/ Scott A. Roberts
> Scott A. Roberts